349 So.2d 265 (1977)
Thomas J. MILLER
v.
Dutriel Michael KEATING et al.
No. 59042.
Supreme Court of Louisiana.
June 20, 1977.
Rehearing Denied September 2, 1977.
*266 John A. Jeansonne, Jr., Law Office of Welton P. Mouton, Lafayette, for defendant-respondent.
Raymond Morgan Allen, Allen, Gooch & Bourgeois, Ltd., Lafayette, for plaintiff-applicant.
CALOGERO, Justice.
The issue in this case is whether the defendant-employer, Kustom Homes, Inc., and its insurer, Hartford Accident and Insurance Indemnity Company, are liable in damages for the tortious acts of Kustom's employees who planned and committed a battery on plaintiff Thomas J. Miller, a former officer and employee of the corporation.
Miller and Dutriel Michael Keating had been organizers, principal stockholders and executive officers in a small Louisiana corporation engaged in the construction of steel frame homes, Kustom Homes, Inc. Johnny Lee Howren and James Guillet were carpenters employed by the corporation. Hartford Accident and Indemnity Insurance Company was the liability insurer of Kustom Homes, Inc., having issued a comprehensive general liability insurance policy, which included general liability and automobile liability provisions.
After a disagreement between Miller and Keating, Miller left the employ of Kustom Homes, Inc., resigning his position as vice-president and construction superintendent.
*267 About three months later, on Monday April 13, 1973 at about ten o'clock in the evening, he was brutally beaten with a pipe as he returned to his trailer home in Lafayette, Louisiana.
Miller sued the corporation, its insurer, and the three corporation employees, Keating, Howren and Guillet, alleging that the employees in the course and scope of their employment for Kustom Homes, Inc. had conspired and together perpetrated the battery upon him in an effort to kill him and thereby generate certain insurance proceeds for the benefit of the corporation. The case was tried before a civil jury which awarded plaintiff damages in the sum of $25,500.00 jointly and solidarily against Keating, Howren, Guillet and Kustom Homes. The jury absolved the insurer Hartford. Judgment was rendered and signed by the trial judge in accordance with that verdict.
Keating and Howren did not appeal; plaintiff Miller appealed contending that his claim against Hartford should not have been dismissed and contending that the damage award was inadequate. Guillet and Kustom Homes, Inc. appealed complaining that judgments should not have been entered against them.
The Court of Appeal rejected Miller's contentions, affirming both the quantum award and dismissal of the claim against Hartford. That Court rejected Guillet's contention and allowed him to remain cast in judgment. Additionally, the Court of Appeal reversed the judgment as to Kustom Homes, finding no liability on the part of the corporation.
Only plaintiff Miller applied to us for review of that judgment. He argues that the assault and battery was committed by Keating, Howren and Guillet within the course and scope of their employment with Kustom Homes; that Kustom Homes was liable for the actions of all three named individual defendants; and that the corporation's insurer should be jointly and solidarily liable, on the basis of its automobile or general liability policy, with the corporation. We granted writs. 341 So.2d 901 (La.1977).
The sordid facts concerning this brutal murder attempt upon the life of plaintiff are substantially set forth in the Court of Appeal opinion and will not be repeated herein. 339 So.2d 40 (La.App. 3rd Cir. 1976). With minor reservations [1] we find those factual conclusions supported by the record. In any case the judgment as to Keating, Howren and Guillet is final. And for the purpose of our consideration of the case at this point the remaining parties do not dispute the Court of Appeal's factual determinations relative to the battery incident.
In order to analyze whether the conduct of the individual defendants fell within the course and scope of their employment with Kustom Homes we find it necessary to relate certain of the pertinent facts. Of the five stockholders in Kustom Homes, Inc. two of them, Keating and Miller, owned a majority of the stock; Keating was president of the corporation and Miller vice-president. At the time of the incident Kustom Homes had loans outstanding in an amount somewhere between $125,000.00 and $130,000.00.[2] President Keating was the corporate executive charged with raising and borrowing money.
Before Miller's resignation from the company there was an outstanding life insurance policy in the sum of $25,000.00 on which the joint beneficiaries were Miller's *268 father and Kustom Homes. Shortly after Miller left the company and just a month or two before the attack upon him, Kustom Homes took out $75,000.00 worth of additional insurance on Miller's life with the corporation as beneficiary; thus the corporation stood to receive $87,500.00 in insurance proceeds in the event of Miller's death.[3] Keating told Howren in the presence of Guillet (he says jokingly) that he wanted to have Miller done away with because of Keating's belief that Miller had stolen money from the company and also because of the existence of certain insurance on the life of Miller. Keating also acknowledged that he was upset at Miller's decision to leave the corporation.
It was established that Howren and Guillet were salaried employees of Kustom Homes and that Keating was their boss. Howren testified that throughout the incident he was following his boss's orders. On the night in question Howren and Guillet were at the company office working, preparing furniture to be moved from the office, just before they left for a pre-arranged meeting with Keating and perpetration of the attack upon Miller; the battery took place at about 10 p. m. A week earlier under similar circumstances they had failed to accomplish their objective because Miller had returned home before Howren and Guillet had arrived. Even prior to that unsuccessful attempt, Howren and Guillet had traveled to Houma, Louisiana and around the Lafayette area to find out, if they could, where Miller was then residing. On the night in question Guillet and Howren were traveling in a company vehicle and Keating in a second company vehicle; the vehicles were equipped with communication radios and the radios were used to coordinate activities of the three, particularly to allow Keating to advise Howren and Guillet when Miller left for home from the residence of his new employer.
The Court of Appeal found that the acts committed by Keating, Howren and Guillet were not committed during the course and scope of their employment or in the exercise of the functions in which they were employed. The Court of Appeal relied upon its interpretation of LeBrane v. Lewis, 292 So.2d 216 (La.1974), a case wherein a supervisor kitchen steward for the Capitol House Hotel in Baton Rouge, Louisiana stabbed a subordinate employee in an altercation following the steward's firing the employee and while escorting him off the premises. The Court of Appeal noted that in LeBrane we considered four factors, "(1) whether the tortious act was primarily employment-rooted; (2) whether the violence was reasonably incidental to the performance of the employee's duties; (3) whether the act occurred on the employer's premises; and (4) whether it occurred during the hours of employment." 339 So.2d at 44.
Then they applied those tests to the facts in the instant suit, and concluded that the acts committed by Keating, Howren and Guillet were not committed during the course and scope of their employment or in the exercise of the functions in which they were employed for Kustom Homes. This conclusion, we believe, was erroneous.
We did not mean to suggest in LeBrane that in all cases of an employer's vicarious liability for the intentional torts of his employee that these four inclusive factors must be met before liability may be found. In that case which involved the conduct of a kitchen steward, a relatively lower echelon employee of the employer hotel, we stated our reasons for finding liability in this way:
"The dispute which erupted into violence was primarily employment-rooted. The fight was reasonably incidental to the performance of the supervisor's duties in connection with firing the recalcitrant employee and causing him to leave the place of employment. It occurred on the employment premises and during the hours of employment.
In short, the tortious conduct of the supervisor was so closely connected in *269 time, place, and causation to his employment-duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interests. It can thus be regarded as within the scope of the supervisor's employment, so that his employer is liable in tort to third persons injured thereby." 292 So.2d at 218
It was our general evaluation of the circumstances of the tort in LeBrane as being one which evolved out of a dispute relating to the employment, one which was reasonably incident to the steward's duties as a hotel employee, and one which was closely connected to those duties (rather than a purely personal matter) which prompted us to regard the incident as one where the risk of harm was fairly attributable to the employer's business.
Each question of an employer's response in damages for the intentional torts of his employee must be looked at on its own merits to determine whether the conduct is to be regarded as within the scope of the employee's employment. While considerations such as whether the tort occurred on employee premises and during working hours are relevant when assessing the conduct of a relatively subordinate employee such as the kitchen steward in LeBrane, they are largely irrelevant in assessing conduct of a corporation's chief executive officer, the president of the corporation such as defendant Keating. In the latter case the conduct must be shown to be employment rooted but not necessarily exclusively so. And it should be reasonably incidental to the performance of his officer's official duties. Beyond these considerations there are no magical requirements. The mission and authority which a legal entity such as a corporation must be presumed to have given its chief executive officer and top human functionary is certainly much broader than that which an employer generally is likely to give or have given lower echelon employees.
In the case at hand, Keating's conspiracy to kill Miller was related to Miller's former employment with the corporation and Miller's presumed non-loyal departure, and it was in large part, although perhaps not exclusively, actuated by Keating's desire to improve the corporation's financial picture, an area of the corporation's concern which had almost exclusively been assigned to Keating, its president, from the inception of the company. Certainly the risk of harm faced by plaintiff Miller was fairly attributable to Keating's employment by Kustom Homes.
Keating's conduct, we conclude, was within the scope of his employment. His employer Kustom Homes, Inc. is thus answerable in damages for the injuries sustained by Miller. La.C.C. art. 2320; LeBrane v. Lewis, supra; Blanchard v. Ogima, 253 La. 34, 215 So.2d 902 (1968).
Because we have found Kustom Homes, Inc. vicariously liable for the tort of its president Keating, we find it unnecessary to consider the question of whether the torts of Howren and Guillet were likewise committed in the course and scope of their employment with Kustom Homes, Inc.
We turn now to the matter of the liability of Hartford Accident and Indemnity Insurance Company. Hartford had issued to Kustom Homes, Inc. a comprehensive general liability insurance policy which included comprehensive general liability and comprehensive automobile liability insurance coverage. The provisions with respect to comprehensive general liability provide that the company will pay on behalf of the insured "all sums which the insured shall become legally obligated to pay as damages" because of bodily injury caused by an occurrence. Inasmuch as we have found that Kustom Homes, Inc. is legally obligated to pay damages to the plaintiff, the insurer Hartford is thus liable in damages under the general liability insurance provisions of that policy. The contrary determination by the jury is unsupported by law.
Because of our finding Hartford Accident and Indemnity Insurance Company liable under the general liability provisions of the *270 insurance policy, we find it unnecessary to consider plaintiff's contention that operation of the company's pick-up trucks by Guillet and Howren and/or Keating on the night of the battery caused the insurance company to be responsible for plaintiff's damage under the automobile liability provisions of that policy.
For the foregoing reasons the judgment of the district court is reinstated except that plaintiff shall have judgment jointly and solidarily against Hartford Accident and Indemnity Insurance Company as well as the other defendants cast in the district court judgment. Costs are to be borne by the defendants.
AMENDED AND AFFIRMED.
SUMMERS, J., dissents for reasons assigned by court of appeal, La.App., 339 So.2d 40.
NOTES
[1] We are not convinced from the record that it was Keating rather than Howren who wielded the pipe during the attack. Nonetheless there was ample evidence, and certainly the more credible, that Keating orchestrated the conduct of the three on the night in question and saw to the consummation of the attack. Keating's alibi testimony and other evidence, and his contention that his sole involvement was simply a joking direction to Howren to do away with Miller is not supported by the record.
[2] As the defendant properly points out, this fact does not necessarily indicate that the corporation was insolvent, for there was evidence that much of the borrowed capital had been employed in purchasing land for residential development, that the land was valuable and that the company still owned it.
[3] There was also some testimony to the effect that the articles of incorporation of Kustom Homes, Inc. required, in the event of a shareholder's death, the surviving heirs to offer to the corporation all of the shares of stock owned by the decedent at a determinable price.