559 So.2d 467 (1990)
Karl F. ERMERT, III
v.
HARTFORD INSURANCE COMPANY, et al.
Nos. 88-C-2391, 88-C-2431, 88-C-2435 and 88-C-2445.
Supreme Court of Louisiana.
March 12, 1990.
Rehearings Denied April 5, 1990.
*468 Joseph S. Palermo, Jr., Bernard, Cassisa, Saporito & Elliott, Metairie, for applicant-defendant Hartford Ins. Co.
Thomas G. Buck, Blue, Williams & Buckley, Metairie, for other respondents.
Daniel L. Dysart, Dysart, Sanborn & Tabary, Chalmette, for applicantLeon Brumfield & Allstate Ins. Co.
Jerald N. Andry, New Orleans, Gilbert V. Andry, III, for applicant-plaintiffKarl F. Ermert, III.
Raymond A. Pelleteri, Ward & Clesi, New Orleans, for applicantR. Bourcq, J.C. Caillouette & State Farm Ins. Co.
DENNIS, Justice.
The major questions in this case in which a duck hunter negligently shot a companion are (1) whether a juridical entity in the nature of an unincorporated association had been formed between the negligent hunter and his hunting friends (presenting the possibility that the association and its members could be held liable) and (2) whether the negligent hunter was acting in the scope of his employment at the time of the accident so as to render his employer vicariously liable. The trial court held that the negligent hunter's employer was vicariously liable but that his hunting friends *469 were not, although they were members of an unincorporated association with him. The court of appeal reversed, holding that the negligent hunter was not acting in the scope of his employment at the time of the accident but that his hunting friends who were present at the time of the accident were vicariously liable as members of an unincorporated association with him. Ermert v. Hartford Ins. Co., 531 So.2d 506 (La.App. 4th Cir.1988). We reverse and reinstate the trial court's judgment. None of the tortfeasor's hunting friends was guilty of any fault that caused the victim's injury, and they had not formed an unincorporated association because the group did not intend to create a separate juridical entity. The negligent hunter was acting within the scope of his employment because as chief executive and majority stockholder of his corporate business he had established the practice of using the camp and his relationship with his hunting friends for the purpose of furthering his employer's business interests.

1. Facts
Plaintiff, Karl F. Ermert, III, was accidentally shot in the foot by Kenneth Decareaux while a guest at a hunting camp. The hunting camp was located on Bayou Bienvenue near Lake Borgne in the marshlands of St. Bernard Parish. It was built in 1975 on property leased from the owner by the defendant Russell Larrieu. Larrieu, Decareaux, Alkaney Cummings, Leon Brumfield, Joseph Caillouette and Robert Bourcq, all long-time friends or acquaintances, constructed the camp building. They had been involved in groups that had hunted together at two other camps, the first of which was destroyed by Hurricane Betsy and the second of which burned down. Only Larrieu contributed money toward the construction of the new camp. The rest of the men contributed various materials, furniture and/or labor. In a transaction separate from the ground lease, Larrieu negotiated an oral lease to hunt ducks on ponds owned by one Dubuchel. Each man paid approximately $52 per year to cover the annual $120 rental for the ponds, as well as supplies for weekends when the group hunted together. Larrieu held the remainder of the funds, and he used these funds for necessities such as butane, utensils, and pots and pans. The cost of groceries was divided equally. The other hunters always sought Larrieu's permission before visiting or bringing guests to the camp as they all considered Larrieu to be its owner; however, he did not deny permission so guests were there fairly frequently.
The group had no written constitution, by-laws or rules. Some basic written safety rules and regulations had been formulated for the earlier camps at monthly meetings held in the 1960's, but these rules were no longer followed by the new group. Although no one voted to abolish these rules, indeed no one voted on anything, the rules "went out of the window" because the group of hunters were friends and got along well together. There were no formal meetings. The men had informal discussions and were generally in agreement about hunting safety matters. The only "rules" the camp had regarding hunting safety were simply common sense guidelines to which all hunters, whether experienced or not, should adhere. Among the guidelines adhered to by the group was the rule that guns should always be empty while in the camp, loaded only while in the duck blinds, and unloaded prior to leaving the blinds for the camp. The men had also decided that they would attempt to tame wild animals near the camp, so they agreed not to shoot at animals near the camp.
Besides being a member of the hunting group, Decareaux was president of and majority stockholder in Nu-Arrow Fence Company. He allowed Larrieu to purchase materials for the construction of the camp at cost through Nu-Arrow's account and then reimburse Nu-Arrow, and he also donated scrap lumber from old fences to Larrieu for use at the camp. In addition, he used Nu-Arrow equipment to help with the camp's construction, and he often transported materials to the camp in Nu-Arrow trucks without compensation.
As the president of Nu-Arrow, Decareaux was expected to seize any opportunity to further the business regardless of time *470 and place. Accordingly, once the camp was built, Decareaux used it to entertain his employees and to promote his business. He invited all of the Nu-Arrow employees to the camp either at the same time or a few at a time. Decareaux paid for their expenses out of the Nu-Arrow petty cash fund. He invited the company-sponsored softball team to the camp as well, because several employees were on the team. Decareaux also took advantage of the camp to develop customers and make sales. He had sold fences to the majority of his fellow hunters, and he derived other business through references given by the regular members of the hunting group. He invited people who had purchased fences from Nu-Arrow to the camp, and these customers also referred business to Nu-Arrow. Decareaux testified that some of the guests were invited because they were relatives or friends, but the relatives were employees and the friends were customers. Thus Nu-Arrow both derived economic benefit and provided economic assistance to the hunting camp.
At the time of the accident, plaintiff Ermert was spending the weekend as a guest of Russell Larrieu at the hunting camp. Ermert, Larrieu, Brumfield, Caillouette, Bourcq and Decareaux were at the hunting camp to build duck blinds for the upcoming duck season. Because he generally worked on Saturdays, Alkaney Cummings had not been at the camp for some time, and he was not there that weekend. The six men spent Saturday building the duck blinds. Saturday night they all ate, drank a little, talked for a while and went to bed.
Decareaux and Caillouette were the unofficial cooks for the group. As the members of the group were awakening on Sunday morning, someone told Decareaux that there was a nutria swimming across the canal. He looked and saw it himself, and he asked Caillouette, who was in the outhouse, if he was interested in cooking it. Caillouette agreed, so Decareaux picked up a shotgun and some shells. In violation of the general agreement among the group, he began loading the shells into the shotgun as he was walking in the camphouse. The gun accidentally fired and struck Ermert's foot, severely injuring it. He was rushed to a hospital, where several surgeries were performed. As a result of this injury, Ermert, a welder, is permanently disabled.

2. Procedural History
Ermert brought suit against Decareaux, Nu-Arrow, and their insurers. In his first supplemental and amending petition, Ermert alleged that Decareaux, Larrieu, Caillouette, Bourcq, Cummings and Brumfield and their respective insurers should be held jointly and solidarily liable as defendants because of their alleged joint venture or partnership relationship. Specifically, Ermert claimed that the hunting camp was owned by an unincorporated association composed of the six hunters in the group. Ermert alleged that Larrieu received annual dues from the other members of the alleged joint venture; that at the time of the accident, the named defendants were at the camp for the purpose of constructing improvements; and that the members of the association were liable to plaintiff for acts of negligence including failure to have rules against the unsafe and hazardous practice of allowing persons in the camp to load weapons in the camp; failure to have rules against the unsafe and hazardous practice of allowing persons in the camp to discharge weapons in the camp; and failing to enforce such rules if they existed. He also claimed that the members were vicariously liable for the negligence of Decareaux because of his co-membership with them.
The trial court granted a motion for summary judgment and maintained exceptions of no cause of action in favor of the hunting group defendants. Plaintiff appealed this decision and the Court of Appeal for the Fourth Circuit reversed, concluding:
The evidence shows that there was a "club." Whether the men were part of a juridical entity which is liable for the negligent shooting or for their failure to formulate safety rules is a question of fact. More information on the organization, membership, meeting and club rules could support a finding of negligence.

*471 The contradictory record does not support summary judgment.
Ermert v. Hartford Ins. Co., 480 So.2d 999, 1001 (La.App. 4th Cir.1985), writ denied, 484 So.2d 672 (La.1986).
The court of appeal thus remanded for trial on the merits.
After a bench trial, the district court issued extensive and detailed reasons for judgment. The judge found that the hunters constituted a "somewhat loose unincorporated association," but they were not a partnership because they were not organized for profit. While he felt that this group could be a juridical entity, he concluded that there was no vicarious liability arising solely out of membership in such an organization. He applied "general agency principles" and concluded that the club members were not vicariously liable for Decareaux's tort because his actions were in direct contravention of the group's established policy. He also found that they had no duty to supervise the safety practices of Decareaux, an experienced hunter. Finally, he stated that La.R.S. 9:2791, which grants tort immunity to landowners who open their land to the public for recreational purposes, further precluded any imposition of liability upon the hunting group. The trial court also held that Nu-Arrow, defendant's employer, benefited from the camp's existence and was therefore liable for its president's negligence while working at the camp, because Decareaux was within the scope of his employment at the time of the accident. The court entered judgment against Decareaux and Nu-Arrow for damages in the amount of $595,000.
Ermert and Hartford Accident & Indemnity Company, Nu-Arrow's insurer, appealed. Ermert claimed that the hunting group defendants should have been held liable along with Nu-Arrow, and he also sought an increase in his damage award. For its part, Hartford argued that the trial court erred in holding Nu-Arrow liable because Decareaux was not acting within the scope of his employment at the time of the accident. Accepting the trial court's determination that the hunting group constituted an unincorporated association, the court of appeal concluded that the members of an unincorporated association could be liable for its torts, that the members had failed to adhere to any safety rules, that Decareaux was acting for the benefit of the association in attempting to shoot the nutria, and that the action was taken with the "passive approval" of the other members. Accordingly, the court held that the members of the hunting group were solidarily liable for the damages, with the exception of Cummings, who was not present at the time of the accident. 531 So.2d at 510-11. On rehearing, the court also rejected the trial judge's conclusion that La.R.S. 9:2791 shielded the members from liability, because the property had been developed and was not open to the public. 531 So.2d at 516.
The court of appeal disagreed with the trial court's finding that Decareaux was within the scope of his employment at the time of the accident. It concluded that on the weekend of the accident Decareaux was engaged in a purely personal recreational pursuit. The court reasoned that the risk of Decareaux shooting someone during such activity was not fairly attributable to Nu-Arrow. 531 So.2d at 513-14. After reviewing quantum, the court affirmed the award of damages. 531 So.2d at 514-15. Accordingly, the court of appeal modified the trial court's judgment to hold the members of the hunting group who were present liable and to exonerate Decareaux's employer and its insurer, but the appellate court affirmed with regard to quantification of damages and other issues.
Ermert applied for writs from this Court, asking us to review the court of appeal's reversal as to Nu-Arrow as well as its release of Cummings. Larrieu, Bourcq, Caillouette, and Brumfield, along with their insurers, sought review of the appellate court's decisions holding them liable as members of the association and rejecting the applicability of La.R.S. 9:2731. Due to the novel legal issues raised, we granted the writs and consolidated the applications. 533 So.2d 343, 344 (La.1988).

*472 3. Primary Responsibility
The issues of primary responsibility are easily resolved. Without a doubt Decareaux was guilty of negligent acts that caused severe injuries to the plaintiff, Ermert; the lower courts' findings that Decareaux was negligent are not challenged here. Decareaux and his homeowner's insurer are solidarily liable for those damages. On the other hand, the remaining members of the hunting group clearly were not guilty of any separate or joint negligence, imprudence or want of skill that caused the accident. See La.C.C. arts. 2315, 2316, 2324.
Due to the speed with which he grabbed, loaded, and accidentally fired the shotgun, none of the other members of the hunting party had a realistic opportunity to admonish or restrain Decareaux. As a coequal member of the group, Decareaux was not the charge of anyone. He was an experienced hunter who apparently had not been known to act carelessly before. He was well aware of the group's firmly established, though unwritten, rules against loading guns in the camphouse and shooting animals near the building, but he ignored these prohibitions. Under these circumstances, none of the members of group could have anticipated or taken precautions against Decareaux's careless action. La. C.C. arts. 2315-2316. The evidence is also clear that none of the other hunters caused, assisted or encouraged Decareaux's negligent act of loading the shotgun inside the camphouse as he moved quickly toward the door. La.C.C. art. 2324 (1870). Although Caillouette approved the general idea of cooking a nutria, he did so while in the outhouse, and he was not in a position to either approve or influence the negligent method chosen by Decareaux to accomplish that end. Accordingly, Larrieu, Cummings, Brumfield, Caillouette and Bourcq cannot be held primarily liable for the injuries to Ermert.

4. Secondary Responsibility

A. Whether An Unincorporated Association or Its Members are Vicariously Liable
The trial court tentatively found, and the court of appeal accepted the finding, that the group of hunters "constituted a somewhat loose unincorporated association." The court then selected and applied legal precepts to determine that the members of the association should not be held responsible for the acts of their fellow member under facts of this case. The court of appeal reversed the trial court's decision in this respect because it disagreed with the trial court's choice of legal principles and its resulting judgment. In our opinion, however, both the trial and appellate courts committed errors of law. By assuming that an unincorporated association, as a separate juridical person, existed in this case, the lower courts failed to apply the appropriate legal precepts to determine if such an association had been formed.
In an explicit statement of traditional civilian doctrine and ideas inherent in the Louisiana Civil Code of 1870, the 1988 revision of Civil Code article 24 identifies two kinds of persons: natural persons and juridical persons. La.C.C. art. 24 and comments (a)-(c). The article provides in pertinent part:
A juridical person is an entity to which the law attributes personality, such as a corporation or a partnership. The personality of a juridical person is distinct from that of its members.
Comment (b) to the article states that an unincorporated association may possess legal personality for certain purposes. The comment is consistent with other provisions of the Code, other statutes, and our jurisprudence. An unincorporated association may acquire and possess estates and have common interests as well as other private societies; it may alienate or encumber title to immovable property to any person, unless otherwise provided by its constitution, charter, by-laws, rules or regulations under which it is organized. La.R.S. 9:1051 (formerly La.C.C. art. 446, redesignated as R.S. 9:1051 pursuant to 1987 La.Acts No. 126, § 2); United Brotherhood of Carpenters Local 1846 v. Stephens Broadcasting Co., 214 La. 928, 39 So.2d 422 (1949); Le Blanc v. Lemaire, 105 La. 539, 30 So. 135 (1901). It has the procedural capacity to *473 sue and be sued in its own name. La.C. C.P. arts. 689, 738. An unincorporated association may become a party to a contract of partnership, as may any other juridical person, such as a corporation, a partnership or a natural person. La.C.C. art. 2801 and comment (a). It may be involuntarily dissolved and liquidated subject to supervision by a court as provided by law. La. R.S. 12:501-505; Levy v. Bonfouca Hunting Club, 223 La. 832, 67 So.2d 96 (1953). An unincorporated association may also be liable in tort for defects in property owned by it or for the negligence of its servants. Vredenburg v. Behan, 33 La.Ann. 627 (1881). From these authorities, one can conclude that an unincorporated association possesses full capacity. As one commentator has noted, "Corporate attributes of a limited kind have a tendency to proliferate towards producing the complete legal person." H. Ford, Unincorporated Non-Profit Associations 113 (1959); see also F. Lawson, A. Anton & L. Brown, Amos and Walton's Introduction to French Law 55 (3rd ed. 1967); 1 M. Planiol & G. Ripert, Traité Élémentaire de Droit Civil No. 3016 (La.St. L.Inst. trans. 1959).
The most commonly regulated form of unincorporated association has been that formed for profit, the partnership. The 1980 revision of the partnership articles of the Civil Code regulates the incidents of juridical personality of partnerships. La. C.C. arts. 2801-2807. The provisions of the Louisiana Civil Code of 1870 regulating corporations, La.C.C. arts. 427-442, 444-447 (1870), which formerly served as the general law of Louisiana regulating the incidents of juridical personality, have been repealed or redesignated. 1987 La.Acts No. 126. Nevertheless, courts may refer to the principles underlying those articles, insofar as consistent with current law, along with traditional civilian conceptions, doctrine and jurisprudence. See generally, A. Yiannopoulis, Louisiana Civil Law System 105-109 (1977). Except to the extent modified by special legislation, we apply these principles, along with those from the current partnership articles that are applicable by analogy, to determine the law applicable to the creation of other juridical persons.
Under both civilian and common law theory, an unincorporated association is created in the same manner as a partnership, by a contract between two or more persons to combine their efforts, resources, knowledge or activities for a purpose other than profit or commercial benefit. See United Brotherhood of Carpenters Local 1846 v. Stephens Broadcasting Co., 214 La. at 938, 39 So.2d at 425 (the charter, constitution and by-laws of an association "constitute and are the contract between the members and the association"); 2 M. Planiol & G. Ripert, supra, No. 1988; E. Church, Business Associations under French Law § 1, at 3 (1961); H. Smith, The Law of Associations 18 (1914); cf. La.C.C. art. 2801 ("A partnership is a juridical person... created by a contract"). Except as otherwise provided by law, the contract of association is governed by the Civil Code provisions pertaining to conventional obligations. 2 M. Planiol & G. Ripert, supra, No. 2007; cf. La.C.C. art. 2802. Planiol describes the essential nature of the contract as follows:
The association is the contract by which several persons put in common their activity and in case of need, revenue or capital with a purpose other than to share in the benefits. This contract permits the attainment of a purpose or the exercise of influence, which for individual persons acting alone would be more difficult or even impossible.
2 M. Planiol & G. Ripert, supra, No. 1988.
Under the French Law of 1 July 1901, an association may acquire juridical personality by complying with certain formalities of registration; if these formalities are not met, then the resulting association has no legal capacity. 1 M. Planiol & G. Ripert, supra, No. 3042; 2 id. Nos. 2015-2016; E. Church, supra, §§ 11-15. Thus the members of an association can express their intent for the association to be a separate entity by complying with these registration requirements.
*474 The common intent of the parties is the controlling factor in interpreting a contract. La.C.C. art. 2045. Although our law does not provide for a public display of the parties' intent as does the French statute, we nevertheless conclude that for an unincorporated association to possess juridical personality, the object of the contract of association must necessarily be the creation of an entity whose personality "is distinct from that of its members." La. C.C. art. 24. Unless such an intent exists, the parties do not create a fictitious person but instead simply incur obligations among themselves. Consequently, an unincorporated association, as a juridical person distinct from its members, does not come into existence or commence merely by virtue of the fortuitous creation of a community of interest or the fact that a number of individuals have simply acted together; there must also be an agreement whereby two or more persons combine certain attributes to create a separate entity for a legitimate purpose. While the parties need not specifically intend or have knowledge of all the legal ramifications of juridical personality, they must at least conceive of their creation as a being or thing separate from themselves. See, e.g., Succession of Fisher, 235 La. 263, 274, 103 So.2d 276, 280 (1958); Lord v. District VIII Baptist Convention, 391 So.2d 942, 944 (La.App. 2d Cir.1980); cf. La.C.C. art. 2801 comment (a).
After carefully reviewing the evidence, we conclude that the duck hunters never agreed or consented to form any such separate entity. Larrieu, Decareaux, Cummings, Brumfield, Caillouette and Bourcq had been friends and had hunted together for a number of years before the accident. Some of them, including Larrieu and Decareaux, had been part of a larger group that hunted together at previous sites. In 1975, the existing camp burned, some of the members of that earlier group became dissatisfied and departed, and Larrieu decided to lease a campsite and build a camp for himself. He informed his five friends that if they helped him build the camp, they could use it. Although the members of the group assisted him in constructing the camphouse, he was the leaseholder and the owner of the improvements. Each of the members of the group testified that it was well understood that he had to check with Larrieu before visiting or using the camphouse. The camp (not the group) was known as "Little Mex's" camp because that was Larrieu's nickname. Larrieu also obtained a lease of hunting rights on ponds some distance from the camphouse for $125 per year. To pay for the hunting rights lease (not the campsite lease) and to defray other expenses, the six hunters each contributed $52 per year. Larrieu collected the money from each of his friends when they came by his place of business and kept informal notes on what he paid out. In addition to paying for the hunting lease, he spent these funds for necessities and supplies such as butane. All money for improvements to the camp itself, however, were paid by Larrieu personally.
The six duck hunters never drew up a contract, constitution, by-laws, or any written instrument. There was no testimony that they entered an oral agreement to create an entity separate from themselves. The hunters had established such a rapport and were in such accord that they had no need even for written hunting rules. When they had been part of a larger group that hunted at the two previous sites, they had reduced a dozen or so simple safety rules into writing, but they did not include any provisions for governing their relationship. When they reduced the size of the group and moved to Larrieu's camp, however, they found even those rules unnecessary because they all got along well and knew that each individual was familiar with common sense hunting safety. There was no name given to their group, no officers elected or appointed and no formal meetings held, because the six friends did not consider that they had created any fictional being separate from themselves that required any government.
Larrieu's testimony in this regard epitomizes that of his friends and, for that matter, all of the evidence on this subject:
Well, there really wasn't any such thing as a club. There was no officers.

*475 There was no president, no secretary. It's just a group of guys that wewhen we first started we were going to lease some pond in another location, okay. And that was going to be it. As soon as the hunting season was over that was going to be the end of the little get together..... [T]he hurricane came and we built camp number 2 and that is how this thing originated, turned in to be a group of guys going to a camp and hunting. There was never no club really actually formed. It was just a group of guys that started out to go hunting. And then in 1975 I decided to go and build this other camp and that is how we continued. Actually it wasn't a club. It's a group of guys that go hunting, fishing, and go down and do a little bunch of cooking or whatever.
The sum and substance of their community of interest was that of leasing a hunting site; building duck blinds prior to the season; hunting, eating, drinking and socializing together during the duck season; sharing the expense of groceries after each hunt (each man brought his own alcoholic beverages); and discussing plans for the next hunt.
These parties did not intend to form an unincorporated association. Rather, the evidence is clear that each of the hunters had an agreement with Larrieu by which in exchange for his help and a small sum of money to cover expenses, Larrieu allowed him to use the camp. The parties to such a contract do not incur any vicarious liability for one another's tortious acts. Since the parties did not agree to create an association, no association existed, and we need not consider the issues of an unincorporated association's vicarious liability for the torts of its members and the members' personal liability for the debts of such an association. See Morris, Developments in the Law 1985-86Business Associations, 47 La.L.Rev. 235, 247-48 (1986). Similarly, we pretermit the question of the applicability of La.R.S. 9:2791. Since Larrieu, Cummings, Brumfield, Caillouette and Bourcq have no vicarious liability based on any membership in an unincorporated association with Decareaux, and since there is no allegation or proof that Decareaux was the servant of any of them, these individuals are not secondarily liable for the negligence of Decareaux in shooting Ermert's foot.
B. Whether Decareaux's Employer, Nu-Arrow Fence Co., is Vicariously Liable for the Damage Caused by Him
The second issue of vicarious liability concerns that of Decareaux's employer, Nu-Arrow. The facts of the present case are somewhat atypical in that Decareaux was not a rank and file employee but the founder, majority stockholder (60%), president and chief executive officer and primary business generator of a closely-held corporate business. The trial court weighed the evidence and concluded that, because Nu-Arrow derived economic benefit from Decareaux's activities at the camp, Nu-Arrow was vicariously liable. The court of appeal reversed, holding that Decareaux was engaged in what it termed a "recreational pursuit" in building the duck blinds. We look to basic principles and cases applying them to executive conduct in determining whether Decareaux was a servant of Nu-Arrow acting within the scope of his employment when he accidentally shot Ermert. Upon reviewing the record and the law relating to the vicarious liability of masters for their servants' torts, we find that the court of appeal erred in reversing as to Nu-Arrow, because the trial court's conclusion that Decareaux was within the scope of his employment was not clearly wrong. See, e.g., Austen v. Sherwood, 446 So.2d 274, 279-80 (La.1984) (Watson, J., on rehearing).
Masters and employers are answerable for the damage caused by their servants in the exercise of the functions in which they are employed. La.C.C. art. 2320; La.C.C. art. 176 (1870). Both the civilian master-servant doctrine and its common law counterpart, vicarious or imputed liability or respondeat superior, are based on Roman law. See Blanchard v. Ogima, 253 La. 34, 42-44, 215 So.2d 902 (1968); Holmes, Agency (pt. 1), 4 Harv.L.Rev. 345, 349-51 (1891). The history and parallel development of *476 these doctrines are so similar that the common law does not represent a departure from our civilian law in this field. Blanchard v. Ogima, supra. Consequently, our jurisprudence has drawn freely from the common law in applying the general code principles to concrete master-servant problems. LeBrane v. Lewis, 292 So.2d 216 (La.1974); Blanchard v. Ogima, supra.
A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control. Blanchard v. Ogima, supra; Restatement (2d) of Agency § 220(1) (1958). The word "servant" does not exclusively denote a person rendering manual labor; rather, it includes anyone who performs continuous service for another and whose physical movements are subject to the control or right to control of the other as to the manner of performing the service. Thus, ship captains and managers of great corporations are considered servants, albeit superior servants, differing only in the dignity and importance of their positions from those working under them. While the rules for determining liability of the employer for the conduct of both superior servants and the humblest employees are the same, the application of these rules may differ due to the dissimilarity of their duties and responsibilities. Restatement (2d) of Agency § 220 comment (a).
The master's vicarious liability for the acts of its servant rests not so much on policy grounds consistent with the governing principles of tort law as in a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities. Ira S. Bushey & Sons v. United States, 398 F.2d 167, 171 (2d Cir.1968); 2 M. Planiol & G. Ripert, supra, No. 911; Douglas, Vicarious Liability and the Administration of Risk I, 38 Yale L.J. 584, 586 (1929). In determining whether a particular accident may be associated with the employer's business enterprise, courts often attempt to determine whether, considering the authority given to the employee, the employee's tortious conduct was reasonably foreseeable. 5 F. Harper, F. James & O. Gray, The Law of Torts § 26.7, at 27-28 (2d ed. 1986); Smith, Frolic and Detour (pt. 2), 23 Colum.L.Rev. 716, 724 (1923). What is considered reasonably foreseeable in this context, however, is quite different from the "foreseeably unreasonable risk of harm" that spells negligence. Rather than looking for risks that can and should be avoided, as is the case with negligence, the court must essentially decide whether the particular accident is a part of "the more or less inevitable toll of a lawful enterprise." 5 F. Harper, F. James & O. Gray, supra, § 26.7, at 28. The foresight that should impel the prudent man to take precautions is not the same measure as that by which he should perceive the harm likely to flow from his commercial activity in spite of all reasonable precautions on his own part. If the particular harm was reasonably foreseeable and the employer failed to take proper precautions to prevent it, he could be primarily liable for his own fault rather than secondarily liable for the fault of his employee. 2 M. Planiol & G. Ripert, supra, No. 907A; P. Atiyah, Vicarious Liability in the Law of Torts 19 (1967). When considering which risks the employer must bear under vicarious liability, however, the proper test bears more resemblance to that which limits liability for workers' compensation than to the test for negligence, because the employer should be held to anticipate and allow for risks to the public that "arise out of and in the course of" his employment of labor. Ira S. Bushey & Sons v. United States, 398 F.2d at 171, quoting 2 F. Harper & F. James, The Law of Torts 1377-78 (1956); cf. 1 W. Malone & A. Johnson, Workers' Compensation Law & Practice §§ 141, 191, in 13 Louisiana Civil Law Treatise (2d ed. 1980); Calabresi, Some Thoughts on Risk Distribution and the Law of Torts, 70 Yale L.J. 499, 544 (1961).
Because vicarious liability is imposed based upon the attribution of business-related risks to the enterprise, specific conduct may be considered within the scope of employment even though it is done in part to serve the purposes of the servant or *477 of a third person. The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. Miller v. Keating, 349 So.2d 265, 269 (La.1977); Restatement (2d) of Agency § 236; cf. 1 W. Malone & A. Johnson, supra, § 161, at 309. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act is otherwise within the service. Austen v. Sherwood, supra; Miller v. Keating, supra; Gilborges v. Wallace, 78 N.J. 342, 396 A.2d 338 (1978); Best Steel Bldgs. v. Hardin, 553 S.W.2d 122 (Tex.Civ.App.1977). So also, the act may be found to be in the service if not only the manner of acting but the act itself is done largely for the servant's purposes. Restatement (2d) of Agency § 236 comment (b).
The scope of risks attributable to an employer increases with the amount of authority and freedom of action granted to the servant in performing his assigned tasks. P. Atiyah, supra, at 209-10; cf. 1 W. Malone & A. Johnson, supra, § 161, at 309-10. This is the logical extrapolation of a rule that fixes liability based upon the course of employment: The greater potential course of employment expands the servant's potential opportunities to commit torts. These opportunities are maximized where the servant effectively determines the course of his own employment, as is the case when the servant is actually the owner of the enterprise. One of the advantages of creating a separate entity for the operation of the enterprise is that the business enterprise is not liable for all of the torts of its owner. Nevertheless, because of both the business owner's inherent incentives to pursue company interests whenever possible and the fact that the "servant" often controls the "master" rather than vice-versa, the line between "business" and "personal" activity is often a hazy one.
The problem of determining the scope of executive employment often arises in intentional tort cases, in which the court must determine if the executive's intentional wrongful act is attributable to the employer. While there is no black letter rule on when liability should attach in such situations, this court and others have generally imposed responsibility upon the business enterprise where the conduct in question was at least partially motivated by an intent to serve the interests of the business. In Miller v. Keating, supra, a corporate president planned and executed an assault and attempted murder of the corporation's former vice-president, and the vice-president sued the corporation. The corporation was deeply in debt, and it had purchased a significant amount of insurance on the life of the vice-president both before and after he left the corporation. Rejecting the corporation's argument that the time and place of the assault were determinative of the issue, we stated:
Each question of an employer's response in damages for the intentional torts of his employee must be looked at on its own merits to determine whether the conduct is to be regarded as within the scope of the employee's employment. While considerations such as whether the tort occurred on employee premises and during working hours are relevant when assessing the conduct of a relatively subordinate employee such as the kitchen steward in LeBrane [v. Lewis, supra], they are largely irrelevant in assessing conduct of a corporation's chief executive officer, the president of the corporation such as defendant Keating. In the latter case the conduct must be shown to be employment rooted but not necessarily exclusively so. And it should be reasonably incidental to the performance of the officer's official duties. Beyond these considerations there are no magical requirements. The mission and authority which a legal entity such as a corporation must be presumed to have given its chief executive officer and top human functionary is certainly much broader that that which an employer generally is likely to give or have given lower echelon employees.
349 So.2d at 269.
Because the assault was in large part, although perhaps not exclusively, motivated *478 by the president's desire to improve the company's financial position, we went on to conclude that the conduct was within the scope of his employment. Id.
Other state courts have reached similar results in defining the scope of executive employment. A corporation was held liable for an assault directed and participated in by its manager in Fields v. Lancaster Cotton Mills, 77 S.C. 546, 58 S.E. 608 (1907). Because the manager was "intrusted with the control of its policy and the methods to be employed," the court concluded that the corporation could not avoid liability "for any actions taken by him with respect to the matters it had placed under his control." 77 S.C. at 549, 58 S.E. at 609. In Chesterman v. Barmon, 305 Or. 439, 753 P.2d 404 (1988), the president of a corporation committed an assault while under the influence of a drug. The Oregon Supreme Court, citing the broad authority of the corporation's president, found that his taking of a drug could be within the scope of his employment where he took it under the belief that it would improve his job performance. A corporation was held liable for the conversion of property by its vice-president in Cornell v. Albuquerque Chemical Co., 92 N.M. 121, 584 P.2d 168 (App.1978). The business was a family corporation, but the vice-president was in complete control of all its functions. Because he wielded the executive power of the corporation, the court found that his illegal activities were authorized by the corporation, and the corporation was held liable for punitive damages.
In contrast to these intentional tort cases, in which it must be determined whether the tortious act itself was within the scope of the servant's employment, the court in a negligence case need only determine whether the servant's general activities at the time of the tort were within the scope of his employment. Considering these principles of master-servant liability, we cannot say that the trial court was clearly wrong in determining that Decareaux was acting within the scope of his employment while he was at the camp. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). While Decareaux used the camp partially for his own personal enjoyment and recreation, the record also indicates that he repeatedly and consistently used it for business purposes. Developing new business was a major part of Decareaux's employment with Nu-Arrow. Decareaux testified that he had sold fences to almost every other member of the camp, and that the other members had all referred business to him. He had also taken a number of his preferred customers to the camp for entertainment, and these customers had likewise referred business to Nu-Arrow. Another important aspect of Decareaux's duties was dealing with employees. He testified that he had taken his employees to the camp on several occasions for picnics or entertainment, and he had also hosted his company-sponsored softball team at the camp. Considering this evidence, the finder of fact could reasonably conclude that one of Decareaux's motives for participating in the camp was to provide a place to entertain both customers and employees of Nu-Arrow.
Risks associated with waterfowling are not normally characteristic of the activities of fence companies, of course, but the trial court found that Nu-Arrow had made these risks a part of its business by having Decareaux promote and engage in the activities of the hunting camp in order to obtain direct and referral fence sales. Nor can we say that the trial court erred manifestly in finding that Decareaux was engaged in this facet of his company's business at the time of the accident and that the particular risk which led to the plaintiff's injury was reasonably foreseeable within the context of respondeat superior or master-servant vicarious liability. On the weekend of the accident, Decareaux had gone to the camp to help prepare the hunting blinds for the upcoming season and to fraternize with his hunting companions. We may assume that a major or even a predominant motive for Decareaux's presence was to benefit himself recreationally, but the evidence also supports a finding that the purpose of serving his business *479 actuated him to an appreciable extent. His hunting companions were also his company's customers and referrers of business, and he had to join in preparing the duck blinds to continue to reap the potential benefits of entertaining his company's customers, referrers and employees at the camp during the coming duck season.
It is immaterial that Decareaux's precise action in loading a shotgun while bolting toward the camphouse door was not to be foreseen and was in violation of the usages of his group. In determining vicarious liability, the focus is on the employee's general activities at the time of the accident rather than on the specific tortious act, and the fact that an act is forbidden or is done in a forbidden manner does not remove that act from the scope of employment. Jones v. Thomas, 426 So.2d 609 (La.1983); LeBrane v. Lewis, supra; Restatement (2d) of Agency § 230. The risk that duck hunters might cause damage to companions by mishandling shotguns is enough to make it fair that the loss be borne by the enterprise that made waterfowling activities a part of its business by having its chief executive officer foster and participate in the hunting group for profit. Consequently, the trial court's determination that Decareaux was acting in the scope of his employment when he accidentally injured Ermert was not manifestly erroneous or clearly wrong.

Decree
For the reasons set forth above, the decision of the court of appeal is reversed and the judgment of the trial court is reinstated.
REVERSED; TRIAL COURT JUDGMENT REINSTATED.
LEMMON, J., concurs in part and assigns reasons.
MARCUS, J., concurs in part and dissents in part and assigns reasons.
COLE, J., dissents in part. I do not believe Decareaux was acting in the scope of his employment when he accidentally injured the plaintiff.
MARCUS, Justice (concurring in part and dissenting in part).
I agree with the majority that the negligent hunter's friends who were present at the time of the accident are not liable. However, I do not agree that the negligent hunter's employer, Nu-Arrow, is vicariously liable. I do not consider that the negligent hunter's conduct at the time of the accident was within the scope of his employment. Accordingly, I respectfully concur in part and dissent in part.