WHIPPLE, J.,
dissenting.
Li respectfully dissent from the majority’s conclusion that E. Jacob Construction, Inc. was entitled to summary judgment in its favor, dismissing plaintiffs’ claims against it. I believe that a question of fact *118 remains as to whether the actions of Mr. Fakouri, as owner of and construction supervisor for E. Jacob Construction, in placing a loaded gun on a china cabinet in his home while his work truck was being serviced, were in the course and scope of his employment with E. Jacob Construction and, thus, could result in E. Jacob Construction being vicariously liable for those actions.
Regarding liability of E. Jacob Construction as Mr. Fakouri’s employer, the principle of vicarious liability is derived from LSA-C.C. art. 2320, which provides in part, “[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.” Pursuant to LSA-C.C. art. 2320, an employer can be held liable for an employee’s tortious conduct only if the injuring employee is acting within the course and scope of his employment. Ellender v. Neff Rental, Inc., 2006-2005 (La.App. 1st Cir.6/15/07), 965 So.2d 898, 901.
Generally, courts consider four factors when assessing vicarious liability, including whether the tortious act: (1) was primarily employment rooted; (2) was reasonably incidental to performance of employment duties; |2(3) occurred during working hours; and (4) occurred on the employer’s premises. LeBrane v. Lewis, 292 So.2d 216, 218 (La.1974). Under the LeBrane test, the determinative question is whether the employee’s tortious conduct was so closely connected in time, place, and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer’s business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer’s interest. Ellender, 965 So.2d at 901.
Specific conduct may be considered within the scope of employment even though it is done in part to serve the purposes of the servant or a third person. Indeed, the fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. Ermert v. Hartford Insurance, 559 So.2d 467, 476-477 (La.1990). If the purpose of serving the master’s business actuates, or motivates, the servant to any appreciable extent, the master is subject to liability if the act is otherwise within the service. The focus is on the servant and whether he was motivated, at least in part, to serve the master’s business. Richard v. Hall, 2003-1488 (La.4/23/04), 874 So.2d 131, 138, 152.
In Ermert, the Louisiana Supreme Court addressed the determination of the scope of executive employment in a negligence case. The court noted that while the rules for determining liability of the employer for the conduct of both superior servants and the humblest employees are the same, the application of these rules may differ due to the dissimilarity of their duties and responsibilities. Ermert, 559 So.2d at 476. Additionally, while considerations such as whether the tort occurred on employer premises and during working hours are relevant in assessing conduct of a relatively ^subordinate employee, they are largely irrelevant in assessing conduct of a company’s chief executive officer. See Ermert, 559 So.2d at 477. In a negligence case, the court need only determine whether the servant’s general activities at the time of the tortious conduct were within the scope of his employment. See Ermert, 559 So.2d at 478.
Moreover, the scope of risks attributable to an employer increases with the amount of authority and freedom of action granted to the servant in performing his assigned tasks. Ermert, 559 So.2d at 477; see also *119 Richard, 874 So.2d at 138. As noted by the Court in Ermert:
This is the logical extrapolation of a rule that fixes liability based upon the course of employment: The greater potential course of employment expands the servant’s potential opportunities to commit torts. These opportunities are maximized where the servant effectively determines the course of his own employment, as is the case when the servant is actually the owner of the enterprise.... [BJecause of both the business owner’s inherent incentives to pursue company interests whenever possible and the fact that the “servant” often controls the “master” rather than vice-versa, the line between “business” and “personal” activity is often a hazy one.
Ermert, 559 So.2d at 477.
In Ermert, the president and majority stockholder of a fence company accidentally shot a guest at a hunting camp. Ermert, 559 So.2d at 469-470. As chief executive and majority stockholder, the company president had established the practice of using the camp and his relationship with his hunting friends for the purpose of furthering the business interests of his employer, the fence company. Ermert, 559 So.2d at 469-170. Specifically, he sold fences to most of the other members of the camp, he derived other business through references from regular members of the hunting group, and he entertained customers and employees at the camp. Ermert, 559 So.2d at 470. On the weekend of the accident, the company president had gone to the [4camp to prepare the hunting blinds for the upcoming season and to fraternize with his hunting companions. Ermert, 559 So.2d at 478.
In concluding that the trial court’s finding of vicarious liability on the part of the fence company was not manifestly erroneous, the Court noted that while the corporate president of the fence company used the camp partially for his own personal enjoyment and recreation, he also repeatedly and consistently used it for business purposes. Ermert, 559 So.2d at 478. Thus, the Court concluded that because the corporate president had repeatedly and consistently used the hunting camp for business purposes, the company had made the risks associated with waterfowling (which are not normally characteristic of the activities of fence companies) a part of its business. Ermert, 559 So.2d at 478.
Moreover, the Court found that while the company president was presumably motivated predominately to benefit himself recreationally, the trial court was not manifestly erroneous in finding that “the purpose of his business actuated him to an appreciable extent.” Particularly, he had to join in preparing the duck blinds to reap the potential benefits of entertaining his company’s customers, referrers, and employees at the camp during the coming duck season. Ermert, 559 So.2d at 478-479.
Similarly, in the instant case, while Mr. Fakouri at times used the gun at issue for personal protection on personal trips, the evidence presented in support of the motion for summary judgment, at a minimum, demonstrates that he also repeatedly and consistently used it for business purposes for protection in traveling to business sites in risky or unsafe areas for E. Jacob Construction. Moreover, the evidence suggests that the purpose of serving his business may have actuated or motivated him to an appreciable extent to Rremove the gun, and his other work-related items, from his company truck so that the company truck could be serviced.[1]
*120 Thus, based on de novo review, I would find that E. Jacob Construction failed to establish that it was entitled to judgment in its favor as a matter of law. Specifically, E. Jacob Construction did not make the requisite showing that there is an absence of factual support for an element of plaintiffs’ claims that Mr. Fakouri’s allegedly negligent act of improperly storing the gun after removing it from the company truck in connection with having the truck serviced was not an act in furtherance of E. Jacob Construction’s business. Accordingly, in my opinion, the burden never shifted to plaintiffs to demonstrate that they could cany their burden of proof at trial.[2] See LSA-C.C.P. art. 966(C)(2); Nu-Lite Electrical Wholesalers, LLC v. Alfred Palma, Inc., 2003-1167 (La.App. 1st Cir. 4/2/04), 878 So.2d 660, 663.
Because I would conclude that genuine issues of material fact remain as to whether E. Jacob Construction is vicariously liable for Mr. Fakouri’s actions in removing from his company truck and thereafter negligently failing to properly secure or store the loaded gun he used for protection both personally and while performing the duties of his job as construction supervisor for E. Jacob Construction, I likewise would conclude that the trial court erred in granting summary judgment herein.
For these reasons, I respectfully dissent.

. In support of its motion for summary judgment, E. Jacob Construction argued that it *120 was entitled to summary judgment in its favor because, at the time of the accidental shooting, Mr. Fakouri was not engaged in any work-related activities and was not even at home, where the shooting occurred. However, I find no merit to E. Jacob Construction's attempt to so narrowly construe the principles of employer vicarious liability. Plaintiffs do not contend that the shooting itself was tortious conduct committed by Mr. Fakouri or that the tortious conduct of Mr. Fakouri occurred at the actual time of the shooting. Rather, they contend that his work-related actions in removing the gun from his work truck and thereafter negligently placing it where it was accessible to minors constituted tortious conduct which was a cause of the accidental shooting.

. Nonetheless, I note that Mr. Fakouri's answers to interrogatories, which were offered by plaintiffs in opposition to the motion for summary judgment, further support the result I would reach herein. Specifically, in his answers to interrogatories, Mr. Fakouri stated as follows:
I would always cany a firearm at dark (9:00 p.m. or later) at Woodale Court (near Airline and Tom) which is where the warehouses are where extra building materials are stored for E. Jacob Construction, or construction materials I use to repair rental properties. I had left the gun at my house on May 19, 2006 because I had unloaded the E. Jacob Construction truck of everything I use in my business, so that service could be done on it. Since I was taking my vehicle in for work, I unloaded the vehicle of all my commercial papers, plans and specifications and the gun that I carry out at the warehouses loaded with E. Jacob Construction building materials. If I had not been taking the E. Jacob Construction truck for service, I would not have taken the commercial papers and gun out of the truck because I use the truck like another office. I believe I had last carried the gun late on the evening of May 17, 2006 at the warehouses before I unloaded the truck.