BROOKS *v.* McSPADDEN.

4-9589                                    244 S. W. 2d 144

Opinion delivered December 17, 1951.

*Bernard Whetstone,* for appellants.

*Davis & Allen, W. B. Wagner, H. W. Varner, Williamson & Williamson, W. H. Howard,* and *Walter L. Brown,* for appellees.

GRIFFIN SMITH, Chief Justice.    Brooks & Jean Lumber & Supply Company is a partnership composed of Reuben Brooks and Grady Jean. In December, 1949, the partners sued Claude R. McSpadden, Ed Watt, Charles Eberle, and Superior Oil Company, asking $2,576.32 for cement, drilling mud, and other merchandise supplied in connection with operations McSpadden was engaged in on property in Ashley county in respect of which Superior had acquired rights known as Bradley Lumber Company-Sporat Oil and Gas Leases. Some of these interests relate to contracts executed by H. C. Miller and his wife in 1946.

At the conclusion of plaintiffs' testimony the court found that as to Watt and Eberle a *prima facie* case had not been established, Ark. Stats., § 27-1729, but rendered judgment against McSpadden personally, and decreed a lien on McSpadden's equity, if any, in the oil, gas, and mineral lands, whatever that interest might be, Ark. Stats., § 51-701.

The theory upon which appellant seeks to subject Superior to liability is that its ownership through assignment of the leases was such that the right to contract for drilling was unquestioned, hence the agreements it did make—letter authority to McSpadden dated June 7, 1949, as amended by letter of July 15, 1949—constituted McSpadden a contractor within the meaning of the lien statute; so, irrespective of any intention by Superior to

relieve itself of responsibility for materials sold to Mc-Spadden the purpose must necessarily fail when the terms of the statute are considered.

Appellants' evidence shows that Watt's status was that of a professional contractor who owned his own rigs and drilled wells when satisfactory arrangements could be made. He had formerly done business with McSpadden and was asked to move an outfit to the Ashley county lease and drill the well in question for $21,000, ''plus an interest, probably a fourth,'' in the production. The quoted words are from appellant's brief. Eberle, a Bradley Lumber Company employe, was alleged to have supplied $19,500 to procure the drilling operations. In return he was to receive a fourth of the oil and gas produced.

The Chancellor's determination against a joint enterprise participated in by either Watt or Eberle with McSpadden or Superior must be sustained. Nothing of a substantial character impairing Watt's contention that his transactions with McSpadden were *bona fide* has been shown. Preliminary measures were taken to attach the drilling machinery and other equipment, but it is undisputed that the papers were not served. The record does not disclose any property Watt has in the state. He resides at Arp, Texas, and has effectively—but at a loss, as he claims—closed the unfortunate drilling chapter in Ashley county. Eberle is not shown to have been a party to any joint undertaking and cannot be penalized on suspicion.

As to Superior it is insisted that the litigation is companion to the circuit court action of H. A. Etheridge in consequence of which he successfully established McSpadden's status as a contractor, *The Superior Oil Co.* v. *Etheridge,* ante, p. 289, 242 S. W. 2d 718. Appellants say that the theory on which joint enterprise was claimed against Superior was the *letter agreement,* ''with which this court is familiar.''

It is true that the opinion of July 9th mentions a letter written by Superior to McSpadden, but the date of the letter is not shown. Only the first paragraph is

copied. It discloses Superior's authorization for Mc-Spadden to begin drilling operations on or before August 1, 1949. A footnote says that by subsequent exchange of letters the date was changed to August 21, "and other provisions were added to . . . paragraph 1." The June 7th letter copied in the bill of exceptions in the present appeal contains nine section paragraphs. Like the *letter contract* discussed in the Etheridge case, Mc-Spadden acknowledged execution June 14, but in the current controversy Superior amended the June 7th authorizations and reservations by adding substantial matter. In the second letter the first communication is referred to as a "farm-out" agreement covering Lease A-207—Bradley Lumber Co., *et al.* The substituted conditions and reservations were acknowledged by McSpadden July 19.

The opinion in the Etheridge case makes no reference to the amended contract other than to say that the time for drilling to begin had been extended, and that other provisions were added to the first paragraph. In the instant case the sketchy abstract of these *letter contracts* is not sufficient to permit members of this court to determine what the relative rights and obligations were without turning to the transcript—an independent research we are not required to perform. Rule 9 requires that there be set forth the material parts of the pleadings, facts, and documents upon which appellant relies, together with other matters from the record necessary to an understanding of all questions presented for decision. It is possible, of course, for the transcripts to be passed from one judge to another for an examination of the exhibits in *Etheridge* v. *Superior,* and in *Brooks & Jean* v. *McSpadden, et als.*, but inasmuch as the Etheridge case was in circuit court and the instant case is in chancery, there are possibilities that equities peculiar to the current litigation could have influenced the Chancellor in his decision.

There is a ten-line abstract of W. H. Varner's testimony correctly showing that Superior paid the delay rentals necessary to keep the Bradley Lumber Company

lease alive; that Bradley wells No's 1, 2, and 3 were part of one leasehold; that it is a "consideration" for an oil company to increase the production from an existing well; and, in conclusion, that McSpadden's act in drilling the additional well "was part of the purchase price—part of a contract; it was a purchase price that he would have paid to have gotten the assignment."

Varner was asked whether the "whole field" referred to as Bradley 1, 2 and 3, was part of the lease "that we are referring to as the Bradley lease." The reply was that "they are all located upon various sections of the Bradley Company lease." Question: "The Bradley lease we are referring to is just one lease?" A. "No. There are in fact two leases." [Here the reporter apparently missed part of the answer, but seemingly Mr. Varner said: "The Bradley lease covers one-half of it, and the other lease *covered* by a gentleman named Sprook covers the other half."[1] Continuing, the witness said: "Each of these leases embraces the 3,300 acres, and originally embraced an additional 3,000 or more, but all of them covered these three wells we have discussed."]

The discussion then turned to Bradley No. 1, a well that had yielded on a non-profitable basis. Question: "When Superior had this producer on its hands it was vitally interested in getting an offset well drilled to it as part of the obligation under the lease—was that right?" A. "Not at all. . . . It *is* a consideration [beneficial to] any oil company to get more production from any lease it holds. This is the reason we drilled Bradley No. 2. It is not a direct offset to No. 1. You don't offset wells on your own lease; you offset wells on adjoining leases." Q. "Well, was, or wasn't it, a consideration to Superior to have these additional wells drilled that McSpadden put down?" A. "No, it was a purchase price—part of a contract. It was a purchase price that he would have paid to have gotten the assignment. . . . It was a definite detriment to Superior to have McSpadden drill a dry hole."

---

[1] Very likely "conveyed" was the word used by Varner instead of *covered.*

Pursuing the same line of inquiry the next question put to Varner was: "What I mean [is this] : The *drilling,* one way or another (whether it was going to be dry or not) was a consideration?" A. "That was a consideration in the agreement we made with McSpadden. The agreement, had he completely performed it, would have given him the entire title of the entire lease, subject to various over-riding royalties. . . . We gave [McSpadden] an agreement under the terms of which if he elected to do certain things (which included among others drilling the No. 3 well)—if he drilled that well to a certain depth, and if he did other things that were provided in that contract, we would then assign to him the entire premises; subject, however, to an oil payment and an over-riding royalty interest."

From this testimony, not abstracted, it will be seen that the Chancellor in dismissing as to Superior predicated his decree upon the agreements that are not set out. Assuming that the contracts are those mentioned in the Etheridge opinion, this court, notwithstanding such presumption, is entitled under Rule 9 to have the material portions abstracted in the case at bar. The testimony before the Chancellor is not the same that was heard in circuit court; and while it is true that equity follows the law where imperative statutory mandates require the doing of certain things, or that a particular subject of legislation receive the treatment affirmatively prescribed, yet experience has shown that equities may flow from conduct engaged in by parties who gave but slight attention to the details of procedure.

We are unwilling to say that the Chancellor was wrong on the face of the record as abstracted. It follows that the decree must be affirmed.