CHARLES SPANGLER, EDWARD LOTHROP AND LEWIS CHEVAILLIER v. COMER LUMBER & SUPPLY COMPANY

5-4891                                          439 S.W. 2d 792

Opinion Delivered April 28, 1969

*Keith, Clegg & Eckert* for appellants.

*Bernard Whetstone* for appellee.

JOHN A. FOGLEMAN, Justice. The trial court held that appellants were liable for oil well drilling supplies furnished by appellee for the drilling of a well by one A. A. Morgan. The judgment was based upon a finding of the trial court, sitting without a jury, that appellants were joint venturers with Morgan. Appellants' point for reversal is their assertion of error in the finding as to the joint venture. The question for our determination is whether there was substantial evidence to support this finding. We hold that there was.

Parties to the proceedings in the lower court who are not parties to this appeal, known as the WAG group, were the joint owners of the working interests in an oil and gas lease covering the lands on which the well was drilled. This group engaged one Beverly Johnson to

drill the well on a farmout agreement.[1]   Beverly Johnson arranged a sub-farmout agreement with one A. A. Morgan, under which the obligation to actually drill the well devolved upon Morgan.   The terms of this sub-farmout agreement are not clearly shown.   Morgan owned the necessary drilling equipment but did not have the capital necessary to drill the well to casing point, to perform the necessary tests or to complete the well, if the tests were such as to justify completion.

Beverly Johnson remembered little of his agreement with either the WAG group or with Morgan.   He had some recollection of a letter from the WAG group with reference to the terms, but stated that he had turned this letter over to people in Marshall, Texas, because he had given the deal to them.   He could only remember that the WAG group had retained an overriding royalty. Johnson did not have a drilling rig and made the farmout agreement on the hope that he could get someone to drill the well for a lesser interest in the oil lease than the WAG group would assign to him under the farmout agreement.   The lease was not to be assigned by the WAG group until the well was drilled and completed. Johnson was unable to contract for the drilling of the well upon terms which would permit him to retain any interest.   He recalled having arranged with A. A. Morgan to drill the well for a fixed amount of money plus an interest in the lease.   He testified that the money for the drilling was furnished by people to whom he sold interests at various places.   Johnson said these interests were sold on the basis of the well being drilled and completed for a fixed amount of money to be paid contingent upon completion.   Johnson hoped to make some profit as operator of the well for the owner of the lease.   He would have been paid by the month for supervision and operation of the leases under the arrangement he antici-

---

[1]A farmout agreement is understood to be an arrangement under which the lessee in an oil and gas lease agrees to assign his lease, retaining an overriding royalty only, to one who successfully causes a well to be drilled to a desired depth upon the leased lands.

pated.   The agreement with Morgan was an oral one, and Johnson could not recall the terms as to the amount of money involved or the extent of the interest.   Johnson testified that one of the appellants, Charlie Spangler, from Marshall, Texas, was one of those involved in the "first deal."   Johnson was paid for looking after the first well by Spangler after a second well was completed.   This payment was for supervision and engineering.   His testimony on this point is somewhat equivocal as demonstrated by the following portion thereof:

"Q.   Now, when you made this second deal you still ended up getting a brokerage fee or whatever kind of fee you call it on the second well, is that right?

A.   I got paid for my services looking after the first well and the second well down to casing point.

Q.   Who paid you for your services for looking after the first well?

A.   I was paid after the second well was completed.

Q.   Who paid you?

A.   Mr. Spangler, the operator.

Q.   In what form was the payment?

A.   Money.

Q.   Why would Mr. Spangler be paying you for your services in the first well if Mr. Woodward engaged you?

A.   I said the first well, I was paid for my supervision and engineering the completion of it aft-

er the second well was drilled, and so maybe I didn't get anything on the first one, just got paid on the second well for the whole deal.

Q. Paid in cash?

A. Yes sir.

Q. By Mr. Spangler?

A. Mr. Spangler and his partners."

Johnson stated that the second well was drilled under an arrangement with Spangler and his partners in Marshall, Texas, who he said had interests in the first well.

A. A. Morgan could not recall ever having a letter from Johnson and doubted that Johnson had one from the WAG group about the arrangement among the parties. The entire agreement between Johnson and Morgan was oral. He confirmed Johnson's testimony that he (Morgan) was to get a certain amount of money and a certain interest in the lease if he had completed the well. As he recalled the payment was to have been $18,500 or $19,000 in cash and a one-fourth of the working interest. He stated that his undertaking was a turn-key job, i.e., he was to drill the well to casing point and run and record an electric log after the required depth of drilling had been reached. According to him, he was to bear all of the cost of drilling and testing to that point, when he was to turn the well over to the interested parties free of cost. The only written evidence of the agreement was a letter from Morgan to appellants. The text of this letter is as follows:

"This letter will serve as evidence of our agreement that you are owners respectively to the following extent:

Edward Lothrop

Charles Spangler    12/64th interest to casing point

Lewis Chevaillier   14/64th interest to casing point

These interests being in a well known as the State Moore #1 located in Southeast (SE) Southeast (SE) Sec. 5, Township 20, Range 27 West, Lafayette County, Arkansas, containing forty acres more or less.

It is understood that completion costs will be paid on a pro-rata basis by the interest holders.

Upon completion of title opinion by attorneys you will be forwarded proper assignments.''

Morgan stated his conclusion that appellants were not partners with him and also stated that they did not have any right to tell him how to drill the well or from whom to buy the materials.   He stated that the appellants were joint venturers with him, but explained that he meant that they were, only if the well had been completed.   As he put it, ''If we had made a well and completed it, why everybody would have gotten a pro rata part of it, now, if that's what you're talking about.   If it had made a producing well, everybody would have got their right part.''   He compared the deal with one in which a contractor builds a house for a certain amount of money on a turn-key basis, paying all the expenses and delivering the house to the owner free of expense to him.   Although Morgan admitted that appellants had advanced substantial moneys to him, for which he felt an indebtedness to them because of his failure to perform his contract, he testified in response to leading questions that appellants contributed nothing to the cost and expense of drilling the well and that they were under no obligation to contribute anything.

Appellant Spangler stated that his business and residence addresses were in Marshall, Texas.   He stated that he dealt in oil leases, royalties and in the buying of interests in wells.   He had conducted such operations

in Arkansas during the three or four years preceding. The contract with Morgan was not his first in Arkansas. The Morgan deal was about the fourth well in which Spangler was interested in Arkansas. He testified that Morgan came to Marshall and visited in the home of appellant Lothrop around Thanksgiving in 1959. Morgan sought to interest Spangler and Lothrop in a deal for the drilling of the well. According to Spangler, Morgan wanted to sell more of an interest than they wanted, so they got some of their friends to participate in the transaction with them. Spangler stated that under the arrangement with Morgan, he, Lothrop and their associates put up approximately $21,000 before Morgan did anything, in return for which Morgan was to drill the well to casing point, and, if it were a producer, Spangler and his associates would pay their proportionate part of the completion costs and receive a certain interest in the well. Appellant Chevaillier was interested in the same manner as Lothrop and Spangler, according to Spangler, although Lothrop and Spangler were to have a 12/64ths interest jointly and Chevaillier was to have a 14/64ths interest. Spangler admitted that it was a fair statement to say that he was putting up part of the cost of drilling the well in return for which, if it became a producer, he was to share in the profits. While he never went to the well site during the course of drilling, he admitted receiving cards from Morgan, at intervals, stating the depth at which he was drilling. In response to a request by appellee's attorney that he state the agreement as to the first well, Spangler said:

"* * * The first well was with-we worked with A. A. Morgan and we had, the three of us, Lothrop, Chevaillier and I, and our associates, had 26/64ths in the first well that we bought for a lump sum payment of a well drilled to casing point."

In answer to another question, Spangler testified:

"I put up the amount that was required to drill

the first well and the second well to casing point and I did not obligate myself for anything other than the drilling of the first well and the same thing in drilling the second well. It was a fixed amount of money which I was putting up and under no conditions unless it was a completed well was I ever to put up any more money in the drilling of either wells."

Appellant Lothrop testified that he came in on the well at the time Morgan came down to Marshall to talk about it. According to him, he put up a certain amount of money at the same time Spangler did to buy a fractional working interest in a well. He was a good friend of Morgan and came to visit him at the well site on one occasion while the drilling was going on. He stated that, at the time of the visit, he had an interest in the well, provided Morgan ever got to casing point. Lothrop said that appellants did not have any right to control any of the drilling of the well, nor were any of them competent to do so. He stated that he paid a fixed sum for a specified fractional working interest in the well but that the working interest was never delivered because Morgan was never able to fulfill his contract.

In order to determine whether or not there is substantial evidence to sustain the court's findings, we must consider the testimony in the light most favorable to appellee and draw all inferences favorable to appellee that may be reasonably drawn. In doing so, we take note of the following testimony: that the only written evidence of the agreement between Morgan and appellants states no terms except the interests owned by appellants and the obligation of the parties for completion costs; that this letter purports to be evidence of an agreement by Morgan that appellants "*are* owners" to the extent stated "*to* casing point;" (emphasis ours) that appellants advanced substantial amounts of money for the drilling; that Morgan made fitful reports of progress to Spangler; that Morgan was both a drilling contractor

and the holder of the sub-farmout rights on the lease; that appellants immediately made arrangements for the drilling of a second and successful well without any participation by Morgan after he lost the first one; that Johnson turned over his letter of agreement from the WAG Corporation to appellants, stating that he gave the deal to them; Johnson's statement that the money paid Morgan was furnished by people to whom he, Johnson, sold interests; Johnson's answer as to payment for his supervision and engineering on the first well; the rejection of Morgan's offer of leases in Michigan to appellants in an effort by him to repay them for advances, which he said were unearned; testimony by Spangler that in three previous transactions in Arkansas over the preceding three or four years he had paid a lump sum for an interest in a well drilled to casing point and obligated himself to pay part of the completion costs thereafter. We are unable to say that this testimony does not constitute substantial evidence to support the finding of the circuit judge.

Appellants rely principally upon two cases. They are *Stone* v. *Riggs,* 163 Ark. 211, 259 S.W. 412, and *Brooks* v. *McSpadden,* 219 Ark. 718, 244 S.W. 2d 144. In the former case there was a written contract, and the court was not left to the recollections of oral agreements among parties which probably never were too clearly expressed. Butler-McMurray Drilling Co., under that contract, hired a drilling outfit to Riggs and Pautz, for which they were to receive as compensation a one-eighth interest in certain oil leases. The drillers had no interest whatever in the development of the leased property otherwise. The agreement specifically provided that Riggs and Pautz should bear all the expense of labor, material, and other costs of putting down the wells. Butler-McMurray had nothing whatever to do with the drilling operations. The circuit court and this court held that the agreement on its face and attending circumstances showed that no partnership existed. Thus, no reliance was placed upon the oral testimony of inter-

ested parties as to the effect of their agreement.

In the *Brooks* case, this court affirmed the holding of a chancery court that one Eberle was not a joint venturer with McSpadden in the drilling of a well. Brooks and Jean Lumber and Supply Co. had furnished drilling materials for operations engaged in by McSpadden. Watt was a professional contractor, who owned drilling rigs, with whom McSpadden made arrangement to drill the well in question for $21,000 plus an interest in the production. Eberle was said to have supplied $19,500 to procure the drilling operations, in return for which he was to receive a fourth of the oil and gas produced. This court there said that Eberle was not shown to have been a party to any joint undertaking and that he could not be penalized on suspicion. In the *Brooks* case there was no evidence that McSpadden had transferred his farmout agreement to Eberle in return for the advance of funds by Eberle; that Eberle was the owner of an undivided interest *to* casing point; or that Eberle put up his money without obligating himself for anything *other* than the drilling of the well. The inferences which can be drawn from Spangler's statement with reference to his obligation on the first well are a significant factor in distinguishing his case from *Brooks*.

Appellants argue that there was no evidence of their right to direct and govern the movements of Morgan in respect to the joint venture. There is no evidence that any right of control or direction was exercised by any of the appellants. There is evidence, however, that each of the appellants admittedly had advanced substantial sums of money on the project, although they contend that they had no legal responsibility to do so. The progress reports made to Spangler are also of some significance. We cannot say that there is a lack of the requisite substantial evidence of the right to control.

We do not mean to say that parties cannot enter into an agreement such as the appellants claim was made

774

here. We only hold that the trier of the facts could and obviously did believe those portions of the testimony of appellants and other witnesses consistent with a joint venture and disbelieve other portions. See *Kansas City Southern Ry. Co. v. Dickerson*, 112 Ark. 607, 165 S.W. 951.

The judgment is affirmed.