647 So.2d 1196 (1994)
Bruce T. MASSEY, dba Massey Petroleum, Inc., Plaintiff-Appellee,
v.
DECCA DRILLING COMPANY, INC., et al., Defendants-Appellants.
No. 25,973-CA.
Court of Appeal of Louisiana, Second Circuit.
December 7, 1994.
Rehearing Denied January 19, 1995.
*1198 Mayer, Smith & Roberts by Walter O. Hunter, Jr., Shreveport, Deutsch, Kerrigan & Stiles by Howard L. Murphy, Allen F. Campbell and Victor J. Franckiewicz, New Orleans, for appellant.
Weems, Wright, Schimpf, Hayter & Carmouche by Carey T. Schimpf, Mark W. Odom and Kenneth P. Haines, Robert A. Booth, Jr., Johnson & Thornton by James J. Thornton, Shreveport, for appellee.
Before MARVIN, LINDSAY and HIGHTOWER, JJ.
LINDSAY, Judge.
A jury awarded the plaintiff, Massey Petroleum, Inc., $19 million for breach of a drilling contract and tortious damage to an oil well in southwestern Arkansas.[1] For the reasons assigned below, we affirm in part, reverse in part, and amend in part, the judgment of the trial court on the merits. Additionally, we affirm the trial court judgment dismissing a petition of intervention filed by Massey's investors.

FACTS
The Arkana field is an oil and gas field which lies on the Arkansas/Louisiana state boundary in Lafayette County, Arkansas, and Bossier Parish, Louisiana. In 1982, Lake Ronel Oil Company owned certain leases on the Arkansas side of the border which it "farmed out" to Crystal Oil Company.[2] Crystal, in turn, entered into a "farmout" agreement with Lyle Dews, an oil broker, on May 4, 1982.
The terms of each of these agreements established the time period during which a *1199 test well could be drilled on the property, as well as successive wells which could be drilled if the initial time restrictions were met. (At various points, the agreements were amended to provide time extensions for the drilling of the initial well.) Additionally, the agreements provided the depth to which the well was to be drilled. Both the Lake Ronel and the Crystal farmout agreements required that the test well be drilled at a depth sufficient to test the Cotton Valley formation.[3]
The Crystal/Dews farmout agreement required Dews to drill a test well at his own expense by May 15, 1982; this was later extended to July 15, 1982. If production was obtained, Crystal was required to assign Dews an interest in the leasehold estate; Crystal reserved an overriding royalty interest. If the first well was drilled, Dews had the option to drill additional wells on the acreage.
On June 10, 1982, Dews entered into an agreement with Bruce Massey, d/b/a Massey Petroleum, Inc. In this agreement, Dews agreed to assign to Massey the leasehold estate he acquired under his agreement with Crystal in exchange for $50,000 and an overriding royalty interest. However, Massey's testimony at trial demonstrated that Dews never cashed the checks tendered to him or executed the assignment in Massey's favor.
Massey secured several investors to help pay drilling costs. One of these investors was a company called Lexco, the principal shareholder of which was James Latham, who was also the principal shareholder of Decca Drilling Company. At Latham's request, Massey hired Decca to drill a well in the southern half of the southeast quarter of Tract 10 of the Arkana Field. The well was to be named E.B. Taylor No. 1.
Decca moved its rig on site on July 17, 1982, and drilling commenced thereafter. However, Massey felt that the drilling proceeded at an extremely slow pace. Money disputes arose between Massey and Decca which further retarded the progression of the drilling. On August 27, 1982, Massey and his investors decided to stop drilling at a depth of 9,050 feet instead of proceeding to the initially contemplated depth of 9,500 feet. The depth of 9,050 feet was reached on September 1, 1982. On September 4, 1982, Decca began "rigging down" or dismantling its oil rig.
On September 9, 1982, it was discovered that foreign objects (bolts, tubing and other metal pieces) had been thrown down the well. Investigation revealed that while "rigging down" several disgruntled Decca employees had intentionally dropped these objects down the well. (During the subsequent criminal prosecutions in Arkansas, at least two of the employees pled nolo contendere to criminal charges as a result of the damage.) About 10 feet of debris was removed from the well with a magnet; the remaining 20 feet of junk was pushed down to the bottom of the well. It took four days to remedy the obstruction at a cost of more than $44,000.
The well went into production on November 13, 1982. Shortly thereafter, Decca and others began to file liens against the well. Only 9,514 barrels of oil were produced from the well before it was capped in 1988. The evidence at trial revealed that there has been no additional drilling on the tracts in question since 1982.
Litigation in Arkansas concerning the liens filed against the well was resolved in Dews v. Halliburton Industries, Inc., 288 Ark. 532, 708 S.W.2d 67 (1986). The Supreme Court of Arkansas held Dews responsible for drilling costs because he allowed Massey to incur debt in the hope that Massey would finish the well, even though he knew Massey had breached their agreement by never satisfactorily paying the consideration of $50,000 owed to Dews. The court further found that, due to Massey's failure to pay the $50,000 in a satisfactory manner, Dews never assigned his right to the leasehold estate under the Crystal/Dews agreement to Massey.
The present suit was brought by Massey against Decca for breach of contract and damages resulting from the debris thrown *1200 down the well. He sought to recover the expenses for removal of the obstruction. He also claimed damages for Decca taking twice as long as normal to drill to 9,050 feet and for allegedly denying him the ability to drill further in that well as a result of the debris. He further contended that Decca's actions caused him to lose his option under the farmout agreement to drill successive wells.
Also named as defendants were Decca's insurers, Wausau Insurance Companies and Twin City Fire Insurance Company. (Two other insurers who allegedly covered Decca were also sued but were dismissed before trial.) Decca itself was eventually dissolved in bankruptcy proceedings.
In a supplemental and amended petition, Massey also sought damages for personal injuries he allegedly suffered as a result of the drilling problems, including alcoholism and injuries sustained in a car accident. However, these claims were dismissed pursuant to the defendants' exception of prescription and motion for summary judgment. This court affirmed in an unpublished opinion in No. 24,919 on August 18, 1993. 622 So.2d 869.
Twin City filed a series of motions for summary judgment concerning insurance coverage issues. It claimed that it did not provide coverage to Decca due to the following: (1) a policy exclusion for injury to a well in its oil industry limitation endorsement; (2) a policy exclusion for injury to any real property used by or in the care, custody and control of the insured; and (3) a policy definition of "property damage" as only physical injury to tangible property, not to intangibles like mineral rights. Twin City also sought dismissal of all claims for "consequential damages" which were barred under the drilling contract between Massey and Decca.[4] All of these motions for summary judgment were denied.
An eight-day jury trial was held in April 1993. At the conclusion of the plaintiff's evidence, Twin City and Wausau moved for directed verdicts on eight grounds. The motion was granted as to their claim that the drilling contract (specifically ¶ 14.12) barred recovery of consequential damages in contract; however, the court ruled that such consequential damages might be recoverable under a tort theory. Otherwise, the motion was denied.
On April 28, 1993, the jury found the following: Decca's employees were negligent in damaging the well; Decca was responsible for their tortious conduct; Decca breached its contract with Massey; and the breach caused damages of $19 million ($2.5 million for "physical injury to or destruction of tangible property, including its loss of use," and $16.5 million for "loss of use of tangible property not physically injured or destroyed.") A judgment was signed on May 17, 1993.
Wausau and Twin City filed motions for JNOV, new trial and remittitur. They asserted that the jury awards consisted overwhelmingly of consequential damages barred by the drilling contract. They again asserted that the loss of drilling or mineral rights was not "tangible property" and was thus excluded by their policies. The motions were denied.
Additionally, several of Massey's investors (hereinafter referred to as "the intervenors") filed a petition for intervention on June 25, 1993, more than a month after the signing of the judgment. They asserted that Massey had never informed them of the damage to the well or his lawsuit against Decca. In fact, they contended that they first learned of these matters through a newspaper article reporting the $19 million jury award.
In response to the intervention, the plaintiff filed exceptions of lack of procedural capacity, no right of action, and no cause of action. The trial court denied the exception of lack of procedural capacity; however; the trial court subsequently dismissed the intervention on the peremptory exceptions. Twin City also filed an exception of prescription *1201 against the intervenors' claims, which was denied.
In August of 1993, Twin City and Wausau filed a second motion for new trial on the grounds of newly discovered evidence and an exception of no cause of action after they were contacted by Dews, who they had believed was deceased. They asserted that Dews told them that he had never assigned his rights in the well to Massey because the two checks for $25,000 each, given to him by Massey as consideration, were drawn against non-existent funds. Consequently, the insurers contended that Massey had no right to file suit. This motion for new trial was denied as untimely, and the trial court found that the pending appeal in the case had divested it of jurisdiction to rule on the exception of no cause of action.[5]
Twin City and Wausau filed the present appeal. In Twin City's brief (which Wausau adopted as its own), the following assignments of error are asserted: (1) Decca was not vicariously liable for the criminal acts of Decca's employees in trashing the well; (2) the drilling contract between Massey and Decca, which contained "risk allocation" provisions, barred recovery for direct and consequential damages to the hole; (3) Massey had no right of action to recover for the mineral rights because, by his own admission, he never received an assignment of Dews' interest under the farmout agreement, an issue already resolved in the Arkansas litigation; (4) the trial court improperly inferred coverage under the policies without determining whether the alleged damages legally fit the policy's definition of "property damage"; (5) Twin City's policy barred recovery under its "Oil Industry Limitation Endorsement" and eliminated direct and consequential damages related to and resulting from the insured's improperly performed work; (6) Massey failed to prove that the debris in the well was the legal cause of his loss of mineral rights when the decision not to drill deeper was made before the incident with the debris; (7) the damages awarded by the jury, which were apparently based on the testimony of the plaintiff's expert petroleum engineer, were speculative and grossly excessive; and (8) the trial court erred in refusing to grant a new trial after it erroneously submitted the case to the jury on both the contract and tort theories. Due to our resolution of the case, we find it unnecessary to specifically address the last four assignments of error.
As fully discussed hereafter, we find that Decca is vicariously liable for the intentional acts of its employees. Further, we hold that the provisions of Decca's drilling contract do not absolve it (or its insurers) from liability. However, we sustain the defendants' exception of no right of action as to plaintiff's claim for loss of mineral rights and eliminate those alleged damages from the trial court judgment. We also find that the defendants' policy provisions limit their liability to reimbursement of plaintiff for the damage done to tangible property, which under the facts of this case, is the damage to the well itself, which amounted to approximately $44,000. The other damages assessed by the jury must be set aside.
The intervenors also appealed from the trial court's dismissal of their petition of intervention. We affirm the dismissal.

VICARIOUS LIABILITY OF DECCA DRILLING
Twin City and Wausau contend that Decca should not be held vicariously liable for the intentional acts of its employees in trashing or junking the well. To the contrary, the plaintiff contends that the jury's findings of fact on this issue are not manifestly erroneous and should be affirmed.
Employers are answerable for the damage caused by their employees in the exercise of the functions in which they are employed. LSA-C.C. Art. 2320. Dismuke v. Quaynor, No. 25482 (La.App. 2 Cir. 4/5/94) 637 So.2d 555, writ denied, 94-1183 (La. 7/1/94) 639 So.2d 1164. An employer may have vicarious tort liability for intentional *1202 acts of employees. LeBrane v. Lewis, 292 So.2d 216 (La.1974).
In LeBrane, supra, the Supreme Court considered four factors in determining whether an employer may be liable for the intentional torts of its employees: (1) whether the tortious act was primarily employment-rooted; (2) whether the violence was reasonably incidental to the performance of the employee's duties; (3) whether the act occurred on the employer's premises; and (4) whether it occurred during the hours of employment. In Miller v. Keating, 349 So.2d 265 (La.1977), the Supreme Court explained that it had not intended to suggest that, in all cases of an employer's vicarious liability for the intentional torts of his employee, all four of these factors must be met before liability may be found. The pertinent inquiry is whether the employee's tortious conduct was so closely connected in time, place, and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interest. LeBrane, supra. Each question of an employer's response in damages for the intentional torts of his employee must be considered on its own merits. Miller, supra.
The fact that the predominant motive of the employee is to benefit himself or a third person does not prevent the act from being within the scope of employment. Ermert v. Hartford Insurance Company, 559 So.2d 467 (La.1990). The act may be found to be in the service of the employer if not only the manner of acting but the act itself is done largely for the servant's purposes. Ermert, supra.
The findings that support or refute vicarious liability are factual in nature and, as such, regulated by the manifest error rule. The issue for the reviewing court is not whether the trial court was right or wrong, but whether the factfinder's conclusion was reasonable. Dismuke, supra. Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).
At trial, the plaintiff introduced into evidence the depositions of two Decca employees who pled guilty to criminal charges resulting from the junking of the well, David Joe Burnaman and Steven Charles Johnson. Burnaman admitted his participation and testified that he was mad at Decca as a result of being laid off and hired back several times. He understood that the layoffs were due to financial bickering between Decca and Massey. Consequently, during the process of "rigging down" the Decca drilling rig, he and other employees threw pieces of metal and other debris down the well.
Our examination of the record demonstrates that the LeBrane factors are present. The tortious acts were primarily employment-rooted and reasonably incidental to the performance of the employees' duties in "rigging down." The employees were at the well site as part of Decca's execution of its contract with Massey, and the incident occurred during employment hours. The incident was not a "purely personal matter." Therefore, the jury correctly found that Decca was responsible for the acts of its employees.
This assignment of error is without merit.

THE PROVISIONS OF THE DRILLING CONTRACT
The appellants contend that the provisions of the drilling contract between Massey and Decca, specifically ¶ 14.12, bar the recovery of all consequential damages and that the jury award consists almost entirely of consequential damages. They argue that when the trial court ruled on their motion for directed verdict, it properly held that consequential damages in contract were barred. However, according to the appellants, the trial court erred in then finding that an award of consequential damages might be permissible under "some theory of tort."
The drilling contract entered into by Massey (as Operator) and Decca (as Contractor) was a standard International Association of Drilling Contractors (IADC) "Drilling Bid Proposal and Daywork Drilling Contract." It provided, in part, that "Contractor agrees to perform all work to be conducted by him under the terms of this Contract in accordance *1203 with the orders and directions of Operator, with due diligence and care and in a good and workmanlike manner, and agrees to provide competent supervision of the work performed hereunder."
In other pertinent part, the contract provided:
14. RESPONSIBILITY FOR LOSS OR DAMAGE:
* * * * * *
14.5 The Hole: In the event the hole should be lost or damaged, Operator shall be solely responsible for such damage to or loss of the hole, including the casing therein.
* * * * * *
14.12 Consequential Damages: Neither party shall be liable to the other for special, indirect or consequential damages resulting from or arising out of this Contract, including, without limitation, loss of profit or business interruptions, however same may be caused.
14.13 Indemnity Obligation: Except as otherwise expressly limited herein, it is the intent of parties hereto that all indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, paragraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof (including pre-existing conditions), the unseaworthiness of any vessel or vessels, strict liability, or the negligence of any party or parties, whether such negligence be sole, joint or concurrent, active or passive. [Emphasis added.]
We are only aware of two cases construing contract provisions virtually identical to those contained in the instant contract, Sevarg Co., Inc. v. Energy Drilling Co., 591 So.2d 1278 (La.App. 3d Cir.1991), writ denied, 595 So.2d 662 (La.1992), and Smith v. L.D. Burns Drilling Company, 852 S.W.2d 40 (Tx.App. Waco 1993).
In Sevarg, supra, the operator filed suit against the contractor claiming breach of contract. In its petition, the operator alleged that the contractor had intentionally failed to comply with the mud control program in their contract in order to save money and that this caused damage to the operator. The contractor filed an exception of no cause of action based on the indemnity provisions in their contract. The trial court partially sustained the exception, and the operator appealed. The appellate court overruled the exception in its entirety. It found that the indemnity provisions, which are almost identical to those contained in the present contract, would constitute a violation of LSA-C.C. Art. 2004 because they, in advance, excluded or limited the liability of the contractor for intentional or gross fault that caused damage to the operator.
LSA-C.C. Art. 2004 provides:
Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party.
Any clause is null that, in advance, excludes or limits the liability of one party for causing physical injury to the other party.
Comment (e) of LSA-C.C. Art. 2004 provides: "This Article does not govern `indemnity' clauses, `hold harmless' agreements, or other agreements where parties allocate between themselves, the risk of potential liability towards third persons." [Emphasis added.] In the instant case, we are not dealing with third persons; rather, we are dealing with the relationship between two contracting parties and an act of sabotage by the employees of one party.
Although LSA-C.C. Art. 2004 was enacted by Acts 1984, No. 331, and did not become effective until January 1, 1985, comment (a) specifies that the article did not change the law and cites Freeman v. Department of Highways, 253 La. 105, 217 So.2d 166 (1968), which held that, as a matter of principle, clauses excluding or limiting liability between the parties for intentional fault are invalid.
In the Smith case, supra, the operator and his investors in a gas well filed suit alleging that an employee of the drilling contractor had dropped the production casing down the hole and that his actions constituted negligence, gross negligence, breach of contract, and breach of warranties. The operator and *1204 his investors also claimed that the cost overruns and delays had occurred as a result of the poor condition of the drilling contractor's rig and equipment. The trial court granted the drilling contractor's motion for summary judgment, ruling that the claims were barred by the daywork contract, including a provision releasing the contractor from liability for consequential damages. The appellate court affirmed, holding that, under ¶ 14.5, the operator had assumed liability for all damage to or loss of the hole. The court specifically declined to determine whether the damages sought were consequential or direct, as the operator contended.
Based on Sevarg, supra, we find that the indemnity provisions are null, as being in violation of the principles embodied in LSA-C.C. Art. 2004. Additionally, our examination of the contract leads us to conclude that the parties did not intend to prohibit an award of consequential damages for an intentional tort.
We further find that Smith, supra, a Texas case which apparently did not involve an intentional act of sabotage, is not applicable to the present circumstances.
Therefore, we find no merit to the appellants' assignments of error pertaining to the provisions of the drilling contract.

NO RIGHT OF ACTION BY MASSEY
Twin City and Wausau filed a peremptory exception of no right of action in this court, which this court referred to the merits. They contend that Massey has no right of action to claim any of the lost production from the well, or the right to drill other wells, because of his failure to obtain an assignment of the leases from Dews. In this same vein, they also contend that the Arkansas litigation concluded in the Dews case, supra, fully resolved any question as to Massey's failure to obtain the assignment from Dews. They contend that the foreign ruling is res judicata and entitled to full faith and credit in Louisiana.
Massey responds by pointing out that the appellants never filed an exception of res judicata. Such a peremptory exception cannot be supplied by the court and must be specifically pleaded. LSA-C.C.P. Art. 927. This point is well taken. Therefore, we will not treat this assignment of error as presenting the issue of res judicata or full faith and credit of a foreign judgment.
However, the issue of whether Massey has a right to assert an interest in the mineral rights is properly before us in the form of a peremptory exception of no right of action. Except as otherwise provided by law, an action can be brought only by a person having a real and actual interest which he asserts. LSA-C.C.P. Art. 681. The peremptory exception of no right of action raises the question of whether the plaintiff has any interest in judicially enforcing the right asserted, or, put another way, whether, as a matter of law, the particular plaintiff falls within the general class in whose favor the law grants the cause of action sought to be asserted by the suit. Lambert v. Donald G. Lambert Construction Company, 370 So.2d 1254 (La.1979); Teachers' Retirement System of Louisiana v. Louisiana State Employees' Retirement System, 456 So.2d 594 (La.1984). Moreover, the exception of no right of action, or no interest in the plaintiff to institute the suit, is a peremptory exception which may be pleaded at any stage of the proceedings in the trial court prior to submission of the case for a decision. It may also be pleaded for the first time in the appellate court if pleaded prior to submission of the case for a decision if proof of the ground of the exception appears of record and even may be noticed by either the trial or appellate court on its own motion. LSA-C.C.P. Arts. 927, 928 and 2163. Lambert, supra. Evidence may be received under the exception of no right of action for the purpose of showing that the plaintiff does not possess the right he claims or that the right does not exist. Teachers' Retirement System of Louisiana, supra.
Although the effect of the Arkansas Supreme Court decision in the Dews case is not properly before us, nonetheless, we must look to Arkansas law to determine whether Massey had an interest in the mineral rights because the agreements pertaining to the immovable property at issue here arose in *1205 that state and under its laws. LSA-C.C. Art. 3535.
The Arkansas Statute of Frauds requires that a contract "for the sale of lands ... or any interest in or concerning them" be in writing. Ark.Stat.Ann. § 4-59-101. The Lake Ronel/Crystal farmout agreement and the Crystal/Dews farmout agreement were both followed up with written assignments of their mineral rights after the completion of the well. By his own admission, Massey never received the assignment of Dews' interest in the well, and Dews never cashed the tendered checks. Additionally, Massey never sued Dews to compel specific performance of the terms of their farmout agreement.
Therefore, we find that Massey did not have the requisite interest in the mineral rights to entitle him to seek recovery for their alleged loss. The appellants' exception of no right of action is sustained to the extent that it prohibits Massey from seeking damages for loss of revenues from the well he drilled or from additional wells he might have drilled in the future.

POLICY PROVISIONS
Having found that Decca was vicariously liable for the torts of its employees and that the drilling contract did not prohibit an award of consequential damages for intentional torts, we must now determine whether the insurance policies at issue provided coverage which would obligate the appellants to pay damages under the circumstances of this case. (Although we have already concluded that Massey had no right of action for the alleged loss of mineral rights, nonetheless, we find that this coverage issue merits consideration.)

Definitions
The insurance policies covering Decca provided coverage for "property damage." Both the Twin City and the Wausau insurance policies define property damage as: "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."
The appellants asserted that the policy definition of property damage and the use of the term "tangible" in the definition included only damage to tangible property, or the cost of cleaning up the debris in the well. They raised this issue repeatedly, in one of their motions for partial summary judgment, their motion for directed verdict, and their motion for JNOV, new trial or remittitur. The trial court denied all of these motions. However, the trial court incorporated the policy language pertaining to physical damage and tangible property in the verdict form.[6]
First, we must determine what constitutes "tangible property." "Tangible property" has been equated with the civilian concept of "corporeal property" by the Louisiana Supreme Court. City of New Orleans v. Baumer Foods, Inc., 532 So.2d 1381 (La.1988). LSA-C.C. Art. 461 defines corporeals as things that "have a body, whether animate or inanimate, and can be felt or touched," while incorporeals are "things that have no body, but are comprehended by the understanding, such as the rights of inheritance, servitudes, obligations, and right of intellectual property." Under LSA-R.S. 31:18, a mineral right is defined as an incorporeal immovable. Therefore, we find that the mineral rights at issue may be properly categorized as intangible, not tangible. Because they are not tangible, their loss is not included within the policy definition of "property damage," and the policies provide no coverage.[7] The jury *1206 was clearly wrong in awarding damages for intangible property.
Inasmuch as the policies provide coverage only for damage to "tangible property," those damages for loss of mineral rights and future profit must be set aside.

Oil Industry Limitation Endorsement
The Oil Industry Limitation Endorsement to the Twin City policy further provides:
B. Except insofar as coverage is available to the assured in the underlying insurances at the limits specified in the schedule, this policy shall not apply to:
1. injury to or destruction of ... (b) any well, hole, formation, strata or area in or through which exploration for or production of any substance is carried on...
This issue was raised in one of Twin City's motions for summary judgment, which was denied. However, it was not raised again. Therefore, we find that this issue was not properly preserved for appeal, and we will not consider it.

AMOUNT OF DAMAGES
The jury awarded damages of $19 million, or $2.5 million for "physical injury to or destruction of tangible property, including its loss of use," and $16.5 million for "loss of use of tangible property not physically injured or destroyed." Inasmuch as we have found that the insurance policies fail to provide coverage for the claim of loss of mineral rights, which does not constitute "tangible property,"and that Massey had no right of action to seek damages for loss of mineral rightswe must reduce the damage award made against the appellants/insurers.
The award for "loss of use of tangible property not physically injured or destroyed" is deleted in its entirety.
The award for "physical injury to or destruction of tangible property, including its loss of use," must be reduced significantly. The record demonstrates that the plaintiff incurred the following expenses in removing the debris from the well:

Mosely Well Service $22,000.00
Tri-State Oil Tool Industries 6,609.28
KAT Wireless 750.00
Hall Engineering 2,325.00
Equipment rental 625.00
Piping 4,500.00
Private investigator 7,500.00
 ----------
 Total $44,309.28

The plaintiff is entitled to an award to compensate it for these damages. The judgment of the trial court will be amended accordingly.

INTERVENORS' APPEAL
The intervenors also appeal from the trial court's dismissal of their petition of intervention.
LSA-C.C.P. Art. 1091 which provides as follows:
A third person having an interest therein may intervene in a pending action to enforce a right related to or connected with the object of the pending action against one or more of the parties thereto by:
(1) Joining with plaintiff in demanding the same or similar relief against the defendant;
(2) Uniting with defendant in resisting the plaintiff's demand; or
(3) Opposing both plaintiff and defendant.
An intervention is an incidental demand in a principal action wherein a third person having an interest may intervene in the pending principal action to enforce a right *1207 related to or connected with the object of the principal action. LSA-C.C.P. Arts. 1031 and 1091. Lamana v. LeBlanc, 515 So.2d 622 (La.App. 1st Cir.1987), reversed on other grounds, 526 So.2d 1107 (La.1988). Furthermore, an intervention may not be filed after judgment has been rendered in the trial court on the merits of the principal action, except as provided in LSA-C.C.P. Arts. 1066 and 1092. See Lamana, supra; Thibeaux v. State Farm Mutual Automobile Insurance Company, 285 So.2d 363 (La.App. 3d Cir.1973), writ refused, 287 So.2d 191 (La.1974); Pratt v. Livingston Parish Police Jury, 278 So.2d 897 (La.App. 1st Cir.1973); Louisiana Power and Light Company v. Charpentier, 165 So.2d 614 (La.App. 1st Cir. 1964).
In dismissing the intervention, the trial court found that the intervention was filed after the entry of judgment and that the plaintiff's claims were therefore not pending in the trial court at the time of the filing of the petition of intervention. Thibeaux, supra; Pratt, supra. We agree and affirm the judgment of the trial court dismissing the petition of intervention.

CONCLUSION
The exception of no right of action is sustained.
The judgment of the trial court on the merits is affirmed in part, reversed in part, and amended in part. We accordingly recast the relevant portion of the judgment as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment granted in favor of plaintiff, Massey Company, L.L.C., against defendants, Wausau Insurance Companies and Twin City Fire Insurance Company, in solido to the extent of their respective policy limits, in the sum of FORTY-FOUR THOUSAND THREE HUNDRED NINE AND 28/100 DOLLARS ($44,309.28), plus legal interest from date of judicial demand, until paid in full.
The judgment of the trial court on the intervention is affirmed.
Costs are assessed against the plaintiff/appellee.
JUDGMENT ON THE MERITS AFFIRMED IN PART, REVERSED IN PART, AND AMENDED IN PART. JUDGMENT ON THE INTERVENTION AFFIRMED.

APPLICATION FOR REHEARING
Before MARVIN, SEXTON, LINDSAY and HIGHTOWER, JJ., and PRICE, J. Pro Tem.
Rehearing denied.
NOTES
[1] Suit was originally brought in the name of Bruce T. Massey, d/b/a Massey Petroleum, Inc. In the third supplemental and amended petition, the plaintiffs were named as Bruce T. Massey and Massey Petroleum, Inc. However, when ruling on the defendants' motion for directed verdict, the trial court concluded that the proper party plaintiff was the corporate entity. Thus, judgment was rendered in favor of Massey Petroleum, Inc., only. While this appeal was pending, Massey Petroleum, Inc., was merged into the Massey Company, L.L.C., which was substituted as the proper party appellee.
[2] A farmout agreement is a contract to assign oil and lease rights in acreage upon the completion of a drilling obligation and performance of the other provisions contained therein. Robinson v. North American Royalties, Inc., 509 So.2d 679 (La.App. 3d Cir.1987).

A farmout agreement is understood to be an arrangement under which the lessee in an oil and gas lease agrees to assign his lease, retaining an overriding royalty only, to one who successfully causes a well to be drilled to a desired depth upon the leased lands. Spangler v. Comer Lumber & Supply Company, 246 Ark. 764, 439 S.W.2d 792 (1969).
[3] The Arkana field has several mineral yielding formations. The formation nearest the surface is the Cotton Valley formation, followed by the Haynesville formation. The deepest formation is called the Smackover.
[4] Although the drilling contract itself failed to define the term "consequential damages," in the context of this case, we believe that it would refer to all damages arising from the junk being thrown in the well, including the cost of removing the junk and the alleged resulting loss of mineral rights.
[5] Twin City and Wausau filed a separate appeal of the trial court's denial of their second motion for new trial and its overruling of Twin City's exception of prescription to the petition of intervention (No. 26,425-CA). This appeal of unappealable interlocutory judgments was dismissed on Massey's motion.
[6] Questions have been raised as to whether this issue was properly preserved for appeal. We find that counsel for the insurers adequately preserved their objections when given an opportunity to do so immediately after the jury retired, by reiterating their various grounds for a directed verdict.
[7] See Snug Harbor, Ltd. v. Zurich Insurance, 968 F.2d 538 (5th Cir.1992), in which the court reversed a jury verdict against the insurers; it cited Lay v. Aetna Ins., 599 S.W.2d 684 (Tex.Civ. App.Austin 1980, writ ref'd, n.r.e.), a case brought against an insurer for negligent location of an oil well, where the Texas court held that purchase of an assignment of drilling rights was an economic transaction involving the exchange of money for the privilege of drilling and producing oil and did not constitute injury to, destruction of, or loss of use of tangible property. See also Gulf Insurance Co. v. L.A. Effects Group, Inc., 827 F.2d 574 (9th Cir.1987), which involved the same definition of "property damage" as in the present case and found that strictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment did not constitute damage or injury to tangible property covered by a comprehensive general liability policy; Lowenstein Dyes & Cosmetics, Inc. v. Aetna Life and Casualty Company, 524 F.Supp. 574 (E.D.N.Y.1981), also involving the same definition of "property damage," in which the court found that business losses were not covered; Selective Insurance Company of Southeast v. J.B. Mouton & Sons, Inc., 954 F.2d 1075 (5th Cir.1992), where the court, dealing with the same definition, found that injury to a partnership interest, transfer of land and construction of a building upon it did not constitute "physical injury to tangible property," and claims for loss of future rent involved intangible property.