714 So.2d 845 (1998)
Kimberly HARRINGTON
v.
The LOUISIANA STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION, et al.
No. 97-CA-1670.
Court of Appeal of Louisiana, Fourth Circuit.
May 20, 1998.
Rehearing Denied July 15, 1998.
*847 Madeleine M. Landrieu, Gainsburgh, Benjamin, David, Meunier & Warshauer, New Orleans, for Plaintiff/Appellant.
Richard P. Ieyoub, Attorney General, Rodney A. Ramsey, Assistant Attorney General, Louisiana Department of Justice, Litigation Division, New Orleans, for Defendant/Appellee.
Before BARRY, LOBRANO, ARMSTRONG, WALTZER and CIACCIO, JJ.
BARRY, Judge.
Kimberly Harrington, a student at the Culinary Apprenticeship Program at Delgado Community College, sued the Louisiana Board of Trustees for State Colleges and Universities (State) which operated Delgado Community College and John Veller, a/k/a John Michelli, director of the Culinary Apprenticeship Programs of Louisiana, Inc. Harrington alleged that Veller raped her while he was within the course and scope of his employment. She claimed the State was vicariously liable as Veller's employer and negligent for its failure to investigate Veller's background before hiring him. The State third-partied the Culinary Apprenticeship Programs of Louisiana, Inc.(CALP), but it is not clear whether CALP was served and CALP did not appear at trial.
The State's motion for summary judgment claimed Veller was not an employee of the State, that he was not within the course and scope of employment when he raped Harrington, and the State was not negligent for hiring Veller. The motion was denied. Years later the State re-urged its summary judgment motion which was again denied. This Court and the Supreme Court denied writs (# 97-C-0008 and # 97-CC-0532).
During trial after Harrington rested, the State filed a motion for involuntary dismissal. The trial court stated that after Veller and Harrington left Sal and Sam's Restaurant, the trip to the friend's house was non-business related. Nevertheless, the trial court denied the motion. After the bench trial the court found that Veller raped Harrington and awarded $25,000, but held that Veller was not in the course and scope of his employment and the State was not vicariously liable or negligent for hiring Veller.
Harrington argues that the trial court erred by failing to find the State vicariously liable and negligent for hiring Veller, and by awarding the inadequate amount of $25,000. The State contends that it was not negligent in hiring Veller and Veller was not in the course and scope of employment with CALP or Delgado at the time of the rape.

*848 THE RECORD

Harrington testified that she attended Florida State University for two years in Hotel and Restaurant Management and left to attend the Culinary Apprenticeship Program at Delgado College. She interviewed at Delgado, was accepted into the program, registered at Delgado, and paid tuition. She occasionally saw John Veller, director of the program, at the Convention Center where she worked on Sundays prior to the beginning of class at Delgado (placed there through the program). Classes began on June 10, 1985 and twenty year-old Harrington volunteered to be a teaching assistant. She volunteered to help with a wine tasting class set for the fall and knew she would be expected to attend wine events and gather information for the course. Veller invited Harrington to a wine tasting the night of June 11, 1985 and she accepted.
Harrington said that she and another apprentice had a meeting at the Convention Center relating to a menu for a convention and Veller attended in his capacity as director. Harrington was not familiar with the city so Veller offered to drive her to the wine tasting at the Sheraton and she left her car at the Convention Center. Two University of New Orleans students met Veller and Harrington at the Sheraton. Later, Veller had several business stops to make and he invited the students. Harrington accompanied him to meet owners of restaurants and to make contacts. Veller and Harrington met the two UNO students at the Columns Hotel and had a drink. Harrington met the owner/manager and they stayed about an hour and toured the kitchen. Only Veller and Harrington then went to Key Largo where Harrington visited a friend who was working in the kitchen. Afterward Veller and Harrington went to Sal and Sam's Restaurant and Veller talked to the owner while they ate dinner.
According to Harrington, Veller said that he wanted to stop by the house of a friend, Keith Whitehead. Harrington thought it was on the way back to her car and she welcomed the opportunity to meet Whitehead, who owned a restaurant. Whitehead was not at home, but Harrington met his wife, Betty. Harrington and Veller returned to the car and Veller raped her in the driveway. Afterward, when Veller was driving he said that he wanted to have sex again. Harrington was hysterical and jumped from the car when it was stopped at a red light. Harrington said some people picked her up and took her to a police station. She testified that Veller had been convicted of her rape.
Veller testified that he was hired as the Director of the Culinary Apprenticeship Program in October, 1984 by the Executive Board of Trustees of the Culinary Apprenticeship Program. Prior to being hired, Veller met with Dr. Guyette, the head of the Executive Board, and Elton Lagasse, Veller's boss at Delgado. Two chefs were on Delgado's full-time faculty. Veller said he also had two separate contracts with Delgado to teach classes, one in the program and one open to the public. Veller said that he had a criminal record when he was hired, but neither the CALP Board of Trustees nor Delgado inquired about his past. His convictions were for possession of marijuana with intent to distribute (sentenced to 21 months-served about half), theft or grand larceny (served ninety days with five years of probation), and interstate transportation of forged securities (served twenty months in federal prison). He said he had used the aliases John Michelli and Orlando Navarro, and at the time of his arrest for rape there was an outstanding warrant for his arrest in Illinois.
Veller said that as Director he screened and interviewed applicants, placed students in hotels and restaurants as apprentices, and met with chefs and owners, often during nighttime hours. Delgado did not accept applicants; the Culinary Apprenticeship Program made those decisions. Veller stated that half of his work was in the field; he had to make and maintain contacts in restaurants and hotels. He had an expense account to cover costs of those evenings. Proprietors paid a fee to the program for an apprentice. Veller stated that his basic salary was paid by the Culinary Apprenticeship Program and his checks were signed by Dr. Guyette or himself.
Veller stated that Harrington expressed interest to one of the chefs to be a teacher's *849 assistant. She volunteered to help with a wine tasting class to be added in the fall of 1985. He invited one or two other Delgado students to the June 11, 1985 wine tasting, but they declined. Two UNO students attended. The wine tasting started at 4:00 p.m. and afterward Veller told the students that he had appointments at hotels/restaurants that night. Harrington expressed willingness to attend those meetings and meet owners and/or chefs. Veller testified that he expected that kind of commitment. Veller said that it was customary for students to ride and accompany him to restaurants and have drinks. Veller answered affirmatively when asked whether his relationship with Harrington was purely professional.
Veller said he and Harrington went to the Columns Hotel where he had an appointment to see the chef. Two UNO students met them there. Veller was trying to re-establish a relationship with the hotel after an apprentice left with the former chef to open a restaurant. Veller spoke to one of the owners about placing an apprentice at the Columns under the new chef. The four had drinks, went into the kitchen, and the students met the owner. Veller and Harrington went to Key Largo which had three apprentices. However, Veller wanted to resolve a situation because one apprentice was not working out and there was a possible future opening. He and Harrington had a drink and toured the kitchen, but did not eat because the restaurant was closing. Veller's next stop was Sal and Sam's Restaurant where he and Harrington ate and talked to the owner about hiring a chef and to place apprentices. Veller introduced Harrington to the owner. He said the next stop was the house of a personal friend. The friend, Keith Whitehead, owned a restaurant and was not home, but Veller and Harrington talked to Whitehead's wife.
Veller said when they returned to the car in the driveway he had sex with Harrington even though she told him to stop. Afterward when he stopped the car at the intersection of St. Bernard and Claiborne Avenues, Harrington jumped out. Veller admitted he was found guilty of raping Harrington and sentenced to nine years and eleven months. Veller admitted he drank too much that night. He said that he loaned money to students occasionally and slipped $100 into Harrington's purse for school-related expenses when she refused to accept the money.
Cynthia Hidalgo and Emphrem Rosario testified by telephone deposition that they were in a car behind Veller when Harrington jumped from the car. They said that she was hysterical, running in circles, and was beating on doors and screaming for help. She could not remember her address so Hidalgo and Rosario took her to a police station.
Sgt. Davis, the investigating officer, testified that she was contacted about 12:05 a.m. on June 12, 1985 and took Harrington to Charity Hospital. Harrington was hysterical when she arrived.
Peter Michael, the Columns Hotel General Manager in 1985, testified that Veller visited his establishment on the night in question and appeared to be on a date with the young woman.
Elton Lagasse testified that in 1985 he was Dean of Delgado Community Campus (non-credit college courses) which included the culinary program. Delgado was to oversee the academic side of the program according to the proposal submitted by the Culinary Apprenticeship Program. At the beginning in 1984 the program's students were not receiving college credit but that changed and students could earn an associate degree. Lagasse said he did not know whether students in the summer of 1985 were receiving college credit or paying tuition directly to Delgado. The students of CAPL program were always considered Delgado students and carried Delgado identification cards. He admitted that a 2/1/85 revision (effective date not provided) to the CAP program proposal in evidence referenced a Delgado Culinary Apprenticeship Program Advisory Committee and Lagasse stated that he was a member of that committee. The proposal also stated: that the current selection process of CAPL would continue, but the final candidate selection would remain the responsibility of Delgado; and that Delgado was to petition the *850 Board of Regents to recognize the credits in the program to lead to an associate degree.
Lagasse said that he did not hire Veller as director of that program. Veller was hired by CAPL (which set the curriculum) or by Dr. Guyette. Lagasse answered affirmatively when asked whether he appointed Veller's predecessor in August 1984. Lagasse stated that Veller was a contract teacher of non-credit courses at Delgado, but Delgado did not conduct a criminal background investigation of such instructors. Delgado only verified an applicant's credentials and qualifications.
Harrington introduced into evidence: 1) excerpts from the 1984-1985, 1985-1986, and 1986-1987 Delgado Catalogs which explained the Culinary and Pastry Apprenticeship Programs; the catalogs provided that the student would spend eight hours in the classroom weekly and would earn Delgado credit hours and receive a certificate of completion from Delgado; 2) proposal and revised proposal for the Culinary Apprenticeship Program at Delgado to start with the spring semester of 1984 (not indicate the date the proposals were adopted); 3) the job description for the Executive Director, Veller's position; and Veller's criminal records.

PRIMARY LIABILITY: NEGLIGENT HIRING
Harrington argues that Delgado is liable for negligently hiring Veller, due to felony convictions prior to employment with Delgado.
Under La. C.C. art. 2315 an employer can be held primarily liable for the negligent hiring of an employee. Roberts v. Benoit, 605 So.2d 1032 (La.1991). The standard duty-risk analysis used in all negligence cases is utilized. The court must decide that there was a duty, a breach of the duty, the substandard conduct was a substantial factor or the cause-in-fact of the harm, and the substandard conduct is the legal cause (the risk and the harm caused was within the scope of protection afforded by the duty breached). Jackson v. Ferrand, 94-1254 (La.App. 4 Cir. 12/28/94), 658 So.2d 691, writ denied 95-0264 (La.3/24/95), 659 So.2d 496. When an employer hires an employee who will have a unique opportunity to commit a crime against a third party in the performance of his duties, the employer has a duty to exercise reasonable care in the selection of that employee. Smith v. Orkin Exterminating Company, Inc., 540 So.2d 363 (La.App. 4 Cir.1989).
[I]n determining the exact risks anticipated by the imposition of the duty to use care in employing others, other courts have generally confined this duty to cases where there is a connection between the employment and the plaintiff, that is, where the plaintiff met the employee as a result of the employment and the employer would receive some benefit from the meeting had the wrongful act not occurred.
Roberts, 605 So.2d at 1046.
Veller testified that he met with Lagasse and Dr. Guyette prior to being hired as Director of CALP. He said that Dr. Guyette hired him with Lagasse's approval. Veller admitted that he had a criminal record at the time he accepted the position at Delgado. He stated that he served time in jail for a conviction of possession of marijuana with intent to distribute (sentenced to 21 months; served about half) and theft (served 90 days with a 5 year probation period). He also had served time for a federal conviction on four counts of interstate transportation of forged securities (sentenced to 5 years on each count concurrently-served 20 months). In 1985 when he was hired there was an outstanding Illinois warrant for his arrest. Veller testified that he did not disclose his criminal record to Lagasse or Dr. Guyette. No inquiry was made verbally or on the job application form. He was hired as director of CALP and had separate contracts with Delgado to teach individual courses in catering and introduction to the culinary arts.
Lagasse testified that Veller taught non-credit courses at Delgado. He stated that Delgado's typical background check of non-credit course instructors involved checking a prospective instructor's credentials to make sure that the person was qualified to teach the course. Delgado did not conduct an investigation into a person's background.
*851 Delgado had a duty to use reasonable care when hiring a person placed in a position of authority as a professor. Delgado breached its duty by hiring Veller, a convicted felon who had served time in prison. The fact that Veller was an instructor at Delgado and Director of CAPL put him in a position to harm Harrington; Delgado's conduct was substandard for failing to screen a prospective professor and that was a cause-in-fact of the injury. A professor is in a position where character, moral turpitude, and a clean record should be essential. The risk of being raped or harmed by a professor in a position of authority can be associated with the duty to use reasonable care when hiring.
The trial court erred by concluding that Delgado (the State) was not negligent for hiring Veller.

VICARIOUS LIABILITY
Masters and employers are answerable for the damage occasioned by their servants and overseers in the exercise of the functions in which they are employed. La. C.C. art. 2320. An employer is liable for a tort committed by his employee if the employee was acting within the course and scope of his employment at the time. Orgeron v. McDonald, 93-1353 (La.7/5/94), 639 So.2d 224. Being in the course of employment relates to time and place. Being within the scope of employment involves consideration of whether it is an employment related risk of injury. Benoit v. Capitol Manufacturing Co., 617 So.2d 477 (La.1993). La. C.C. art. 2320.
In order for an employer to be held vicariously liable for a tort committed by the employee, "the tortious conduct of the [employee must be] so closely connected in time, place, and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct instituted by purely personal considerations entirely extraneous to the employer's interest." Baumeister v. Plunkett, 95-2270 (La.5/21/96), 673 So.2d 994, quoting LeBrane v. Lewis, 292 So.2d 216, 217 (La.1974). The employer is vicariously liable only if the employee is "acting within the ambit of his assigned duties and also in furtherance of his employer's objective." Id. at 996, quoting Scott v. Commercial Union Insurance Company, 415 So.2d 327 (La.App. 2 Cir.1982).
The Supreme Court set out factors to consider when deciding whether an employer is vicariously liable for an employee's actions:
1) whether the tortious act was primarily employment rooted;
2) whether the violence was reasonably incidental to the performance of the employee's duties;
3) whether the act occurred on the employer's premises; and
4) whether it occurred during the hours of employment.
LeBrane, 292 So.2d at 218. All four factors need not be met. Miller v. Keating, 349 So.2d 265 (La.1977). The particular facts of each case must be analyzed to decide whether the employee's tortious conduct was within the course and scope of his employment. Baumeister, 673 So.2d at 997.
To determine whether an accident may be associated with the employer's business enterprise, it must be determined whether "considering the authority given to the employee, the employee's tortious conduct was reasonably foreseeable ..." Ermert v. Hartford Insurance Company, 559 So.2d 467, 476 (La.1990). One must consider whether the accident was part of the inevitable toll of a lawful enterprise. Id. The fact that the employee's predominant motive is to benefit himself or a third party does not prevent the act from being considered within the course and scope of employment. "If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act is otherwise within the service." Id. at 477. A district court's determination that a particular act is within the course and scope of employment in order to find vicarious liability is a factual finding governed by the manifest error standard. Baumeister, 673 So.2d at 998.
In Samuels v. Southern Baptist Hospital, 594 So.2d 571 (La.App. 4 Cir.), writ denied 599 So.2d 316 (La.1992), the hospital was *852 found vicariously liable for the rape of a sixteen year-old psychiatric patient by a nursing assistant whose job involved taking care of the patient.
In Dismuke v. Quaynor, 25,482 (La.App. 2 Cir. 4/5/94), 637 So.2d 555, writ denied 94-1183 (La.7/1/94), 639 So.2d 1164, Grambling State University was vicariously liable for the rape of a teenage summer camper in the student union by a technically off-duty aide who had supervisory authority over campers.
In Applewhite v. City of Baton Rouge, 380 So.2d 119 (La.App. 1 Cir.1979), the City was vicariously liable for sexual assault of a teenage girl in a police car while the officers were on duty. One officer used his status to send the victim's two friends away and to force her into the police car.
Veller was acting within the course and scope of his position as Director of the Culinary Arts Apprenticeship Program and as a Delgado instructor when he invited students to the wine tasting. His visits to the Columns Hotel, Key Largo and Sal and Sam's Restaurant were business-related. Veller testified that he was talking to the owner/manager about the placement of apprentices at the first stop, visited apprentices at the next stop and talked to the owner about hiring a chef at the third restaurant. Veller's job was to promote the culinary program, make contacts, and introduce students to owners and chefs to foster apprenticeships and job positions. Veller became director because of his contacts in the restaurant business. Placement of students in restaurants was part of his job and he had an expense account to cover the cost of evenings when contacting owners and chefs. Veller had no set work hours and much of his work was during the evening in restaurants.
Inviting Harrington and other students to a wine tasting event was part of Veller's job. Students like Harrington volunteered to assist with a wine tasting class in the fall and they needed to attend such functions. Students had to go to restaurants and hotels and meet chefs and owners. Veller drove Harrington because she did not know the city and as her supervisor offered to drive to the Sheraton. Harrington accompanied Veller in order to make contacts; the purpose was school-related and not personal or social. The evening consisted of stops at restaurants or hotels during a continuous trip. Harrington got into the car and accompanied Veller from restaurant to restaurant because of his position.
When Veller said that he wanted to stop by Whitehead's house, Harrington had no objection because Whitehead was the owner of a restaurant and she thought the house was on the way back to her car. She justifiably believed the entire evening was school-related. The tortious conduct by Veller was incidental to his job although unauthorized. The harm to Harrington was attributable to Veller's employer(s) due to his capacity at Delgado and with the Culinary Apprenticeship Program. Considering the authority given to Veller, his tortious conduct was reasonably foreseeable. See Ermert, 559 So.2d at 476. Veller abused his position of authority when he raped Harrington.
The trial court manifestly erred by concluding that Veller was not in the course and scope of his employment at the time of the rape. The instructor-student relationship was in effect when Harrington was raped. The State is vicariously liable for Veller's actions.
The judgment in favor of the State dismissing Harrington's claim is reversed.

INADEQUATE AWARD
Harrington argues that the $25,000.00 award was inadequate.
A reviewing court should not disturb a damage award absent a clear abuse of discretion by the trier of fact. Reichert v. State, Department of Transportation and Development, 96-1419, 96-1460 (La.5/20/97), 694 So.2d 193; Reck v. Stevens, 373 So.2d 498 (La.1979). A reviewing court should first determine that an award is below or above that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances. Youn v. Maritime Overseas Corporation, 623 So.2d 1257 (La.1993), cert. denied 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). After that determination, *853 an appellate court can resort to prior awards to decide the highest or lowest point which is reasonably within that discretion. Id. at 1260; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
Harrington testified that she was a twenty year-old virgin before Veller raped her. She said that she screamed and told Veller to stop in the car to no avail. Afterward Harrington was so distraught that she jumped out of the car at the intersection of St. Bernard and Claiborne Avenues. Hidalgo and Rosario, who stopped to help, said that Harrington was hysterical; she was running in circles and beating on doors and screaming for help. Sgt. Davis stated that Harrington was hysterical when she took the victim to the hospital.
Harrington stated that she felt lost after the rape; her whole world came crashing down. She stayed at home with her parents for weeks. Harrington said she did not seek counseling because she felt that telling someone else her problems would not help her. She felt that she had to work through it on her own. Harrington said that although she married, she never had an active sex life with her husband during her five year marriage. She said she saw Dr. Pardue and Dr. Fuchs (at the request of counsel), but talking about the rape made it worse and she was trying to put it behind her. She said that suing Veller and facing him in court was helping her get through the rape. At trial in 1997 Harrington said that she did not have an active sex life at that time and she attributed her sex problems and the break up of her marriage in part to the rape. Harrington stated that she was not able to just go out with friends; she stayed at home where she could feel safe. If she could not feel safe, she would not go somewhere. Harrington declared; "Mr. Veller stole my dignity and he stole my soul. He stole my ambitions. There's not a day that goes by that I don't think about that."
Harrington's mother testified that Kim was totally devastated and cried for days after the rape; she was scared and unable to sleep. Kim lost all her confidence and trust in people; she was insecure and at times depressed and even suicidal. Mrs. Harrington stated that Kim's dream of being a chef with her own catering business was totally shattered. Even twelve years later Kim was unable to trust people, make friends, or have relationships; Kim was still very emotionally distraught.
According to a telephone deposition, Dr. Fuchs, Ph.D. saw Harrington on July 15, 1992 and diagnosed post traumatic stress disorder. Harrington told Dr. Fuchs that she experienced nightmares, felt isolated, and could not trust anyone.
Harrington saw Dr. Pardue, psychiatrist, on May 18, 1992. According to the doctor's deposition, in 1992 Harrington was working freelance in landscaping and architecture. Dr. Pardue noted Harrington's nightmares and difficult sexual activity with her husband, and recommended psychotherapy. Harrington did not see the doctor again until September 11, 1995. Dr. Pardue stated that most of the symptoms of post traumatic stress disorder resolved by 1995. However, Harrington's sexual difficulties had not improved; she was avoiding relationships. Although Dr. Pardue said that Harrington did not fit into a category of psychiatric illness in 1995, she still had problems.
Dr. Roniger, defense psychiatrist, saw Harrington on October 26, 1995. He noted that Harrington finished college at the Art Institute in Dallas, married and divorced for a variety of reasons. She was working as a flight attendant for Southwest Airlines then. In his report Dr. Roniger concluded that Harrington suffered no psychiatric illness.
We find that the $25,000 award was woefully inadequate. The amount is far below that which a reasonable trier of fact could assess. Kim Harrington's dignity and her trust in others was stolen. She has been emotionally devastated and her chance for happiness in a relationship and in her chosen career was destroyed. We find that $100,000 is the lowest award which is reasonably within the trier of fact's discretion to properly compensate her.
The judgment insofar as it dismisses Harrington's claim against the State is reversed and the judgment is amended to increase the amount of the award against John Veller and the State of Louisiana, through the Board of *854 Trustees for State Colleges and Universities, in solido to $100,000 plus interest from demand until paid.

REVERSED IN PART; AMENDED
LOBRANO, J., concurs.
CIACCIO, J., dissents.
LOBRANO, Judge, concurring.
I concur in the majority result for the reason that, in my opinion, the State is independently negligent in failing to do any background investigation before hiring John Veller. Even a minimal check would have revealed Veller's criminal record as described by the majority.
CIACCIO, Judge, dissenting.
I respectfully dissent and would affirm the judgment of the trial court.