881 So.2d 758 (2004)
David Anthony BATES, et al.
v.
Chavez CARUSO, et al.
No. 2003-CA-2150.
Court of Appeal of Louisiana, Fourth Circuit.
July 28, 2004.
*759 Glenn C. McGovern, New Orleans, LA, for Plaintiffs/Appellants.
Sherry S. Landry, City Attorney, Joseph V. Dirosa, Jr., Chief Deputy City Attorney, Annabelle H. Walker, Deputy City Attorney, New Orleans, LA, for Defendant/Appellee.
(Court composed of Judge JAMES F. McKAY, III, Judge TERRI F. LOVE, and Judge MAX N. TOBIAS, JR.).
MAX N. TOBIAS, JR., Judge.
Plaintiff/appellant, David Bates ("Bates"), appeals from a judgment rendered in favor of the defendant/appellee, the City of New Orleans (hereinafter "the City"), stemming from sexual abuse perpetrated upon Bates by former police officer, Chavez Caruso ("Caruso"). After a review of the record and the applicable law, we affirm the judgment.
On 1 October 1992, the City of New Orleans entered into an agreement with the New Orleans Police Athletic League (hereinafter "PAL") to develop a scouting program within the already-existing PAL program. PAL is a recreation-oriented juvenile crime prevention program that relies heavily on athletics and recreational activities to "create and cement the bond between the police officers and the kid on the street." PAL was administered by the New Orleans Police Department (hereinafter "NOPD") as a separate unit of the department. Police officers working with PAL were assigned to the unit and had no other police duties, although they were still paid by the City.[1]
Caruso was assigned as the scoutmaster of PAL Boy Scout Troup # 92. However, *760 as recognized by the trial court, and as supported by the record, the troop was never officially sanctioned by the Boy Scouts of America or its local affiliate. Further, no evidence exists that Caruso received any training on his duties as scoutmaster or that the NOPD promulgated any written rules pertaining to the duties and/or limitations of a scoutmaster.
Caruso had been engaged in an on-again, off-again relationship with the Bates' mother ("Mrs. Bates"), who passed away in 1998. In approximately 1993, after the relationship had ended, Caruso asked Mrs. Bates if the appellant could join Boy Scout Troup # 92.[2] Bates was 15 years of age at the time.[3] In addition to scout meetings, camping trips, and marching in Mardi Gras parades, the members of Troup # 92 often spent time at Caruso's home. Some of them, including Bates, would spend a weekend night at Caruso's house.[4] In particular, Mrs. Bates would frequently allow Bates to spend weekends there, dropping him off on Fridays and picking him up on Sunday mornings. Caruso also had another minor boy living in his home.
On several occasions, while sleeping at Caruso's house, Caruso sexually abused Bates. The abuse never occurred during a scouting activity or scouting overnight. Bates finally told his mother of the abuse in 1995 when he was 16 years old. The abuse was reported to the NOPD, which conducted surveillance and confirmed that adolescent boys were present in Caruso's house. Caruso was eventually arrested and, on 12 August 1997, pled guilty to two counts of molestation, violations of La. R.S. 14:81.2, and one count of aggravated crime against nature, a violation of La. R.S. 14:89.1. He was sentenced to three years at hard labor without benefit of probation, parole, or suspension of sentence.
In October 1997, Bates and his mother, individually and as his administratrix and natural tutor, filed a petition for damages against Caruso, the City, the NOPD, the New Orleans Area Counsel Boy Scouts of America, and Caruso's homeowner's insurer, for pecuniary and non-pecuniary damages suffered as a result of the abuse.
A default judgment was entered against Caruso, while the New Orleans Area Counsel Boy Scouts of America (now the Southeast Louisiana Counsel, Boy Scouts of America) was dismissed without prejudice. However, before being dismissed, the New Orleans Area Counsel Boy Scouts of America answered Bates' discovery. The discovery responses, which were filed into the record, reveal that: (1) Caruso was never affiliated in any capacity as a registered leader with the New Orleans Area Counsel Boy Scouts of America; (2) the appellant was not a registered scout as reflected by the Counsel's records; (3) based upon a search of records back to 1976, Troup # 92 was not a New Orleans Troup, but is located in St. John the Baptist Parish; and (4) the computer files failed to reveal that either Bates or Caruso were ever associated with any organization within the New Orleans Area Counsel.
A bench trial was held on 13 April 2003. On 7 May 2003, the trial court rendered judgment in favor of the City. In its reasons for judgment, the trial court stated:

*761 The threshold question is whether or not Caruso's conduct was in the course and scope of his employment. The Court finds that the conduct was not. The factors to be considered in determining whether an employer may be liable for an intentional tort of an employee are whether the tortious act was primarily employment rooted, reasonably incidental to the performance of the employee's duties, occurred on the employer's premises, and occurred during the hours of employment duties as to be regarded as a risk of harm fairly attributable to the employer's business imposes vicarious liability on an employer. In the case at bar, the acts were committed at the employee's home outside of work hours. The acts did nothing to further the employer's interest, they were entirely personal. This is not to say that the Court is condoning the extraordinarily sloppy policies of the NOPD. To the contrary. But under the relevant case law, the NOPD and the City of New Orleans aren't liable to David Bates.
The issue presented for appeal is whether Caruso's intentional conduct was sufficiently employment-related so that vicarious liability should be imposed upon the City. This question is a mixed question of fact and law, and the trial court's resolution of that question is entitled to great deference on review by the court of appeal under the manifest error standard. Reed v. Wal-Mart Stores, Inc., 97-1174 (La.3/4/98), 708 So.2d 362. Nevertheless, the reviewing court must determine that the record contains sufficient support in the evidence, viewed in the light most favorable to the party that prevailed in the trial court, for a rational trier of fact to have found that the tortious conduct was or was not employment-related. The reviewing court can only reverse a lower court's factual findings when (1) the record reflects that a reasonable factual basis does not exist for the finding of the trial court and (2) the record establishes that the finding is clearly wrong. Russell v. Noullet, 98-0816, p. 5 (La.12/1/98), 721 So.2d 868, 871-72.
The Supreme Court stated as follows in Russell:
The principle of vicarious liability is codified in La. Civ.Code art. 2320, which provides that an employer is liable for the tortious acts of its employees "in the exercise of the functions in which they are employed." While the course of employment test refers to time and place, the scope of employment test examines the employment-related risk of injury. Baumeister v. Plunkett, 95-2270 (La.5/21/96); 673 So.2d 994, 996, citing Benoit v. Capitol Mfg. Co., 617 So.2d 477, 479 (La.1993). The inquiry requires the trier of fact to determine whether the employee's tortious conduct was "so closely connected in time, place and causation to his employment-duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interests." LeBrane v. Lewis, 292 So.2d 216, 218 (La.1974).[5]
*762 Id. at p. 4, 721 So.2d at 871. It is not necessary that all four factors be met in order to find liability. There are no magical requirements and each case must be decided on its own merits. Miller v. Keating, 349 So.2d 265 (La.1977). "Generally speaking, an employee's conduct is within the course and scope of his employment if the conduct is of the kind that he is employed to perform, occurs substantially within the authorized limits of time and space, and is activated at least in part by a purpose to serve the employer." Orgeron v. McDonald, 93-1353, p. 4 (La.7/5/94), 639 So.2d 224, 226-27.
The record clearly demonstrates that the City promoted the PAL scouting program and that the program was used to raise money for it and other PAL activities. In addition, the City received benefits in the form of good publicity from promoting the program through public appearances, like marching in Mardi Gras parades. Insofar as fundraising, businesses in the City contributed money to the PAL program, such as Freeport McMoRan and Entergy.
This court is deeply troubled by the City's actions in this matter. The evidence demonstrates that it promoted a "bona fide" scouting program that did not exist, at least according to the Boy Scouts of America. In addition, it placed Caruso in charge as scoutmaster, despite any confirmation that he had a scouting background and/or the ability or training to assume that position. Further, the record is devoid of any evidence that Caruso was in any way supervised in his activities as a scoutmaster. The City placed Caruso in a position of trust with these young men and their parents without any knowledge or confirmation that any trust was warranted.
On the other hand, as recognized by the trial court, Caruso's crimes were intentional acts that were committed at his home outside of his working hours as a scoutmaster or member of the PAL program. We cannot ignore the fact that Caruso was a presence in Bates' life before the scouting activities began, although the "sleepovers" did not begin until after Bates joined the scouts. In fact, the testimony was that Mrs. Bates viewed Caruso as a "father figure" to her boys and was in favor of the additional time Bates spent with Caruso. This is not to say that Mrs. Bates was in any way responsible for what happened to her son. Instead, it demonstrates that Bates spent time with Caruso that was not primarily employment related or motivated.
We are also aware of the testimony in which Bates links his visits to the Caruso home with the scout meetings that took place on Saturday mornings. While this might explain an occasional Friday night sleepover, it does not account for the additional time spent with Caruso, and does not necessarily confer vicarious liability on the City.
Bates urges the court to follow the reasoning in Applewhite v. City of Baton Rouge, 380 So.2d 119 (La.App. 1 Cir.1979), and Turner v. State, 494 So.2d 1292 (La.App. 2 Cir.1986), to impose liability. However, both cases are distinguishable from the matter before us. In Applewhite, the plaintiff was taken into police custody by a police officer for the City of Baton Rouge, and taken to a desolate location where she was forced to engage in sexual acts with him and a corrections officer employed by the State of Louisiana. The court found that the City of Baton Rouge was liable because the acts were committed by an armed uniformed officer in a vehicle provided by the City under the apparent authority of his position. Id. at 120-21. In the instant matter, no employment-related basis existed for the overnight visits at Caruso's home. We find no connection *763 between the overnights and the approved scouting activities so as to impose liability upon the City.
In Turner, a recruiting officer for the Louisiana National Guard ("LNG") was invited to the Turner home to discuss with four young women their joining the LNG. The officer interviewed the women and then deceived them into believing that he had the authority to conduct a physical exam. He then proceeded to touch the women inappropriately. After being denied admission to the LNG and upon learning that the officer was not authorized to conduct the physical, suit was filed.
Liability was imposed because the court found:
Sudduth's battery upon the young women was closely connected in time, place, and causation to his employment duties. The sergeant visited the girls in his capacity as a recruiting officer after they expressed a desire to enter the LNG. The Turner home where the incident occurred was located in Tensas Parish which was part of the recruiting area assigned to Sgt. Sudduth and the incident occurred during working hours. During the interview process, he mislead the young women into believing that he had authority to conduct a physical examination. Thus, the tortious conduct committed by Sgt. Sudduth was reasonably incidental to the performance of his duties as a recruiting officer although totally unauthorized by the employer and obviously motivated by his personal interests. Furthermore, the sergeant's actions were so closely connected to his employment duties that the risk of harm faced by the young women was fairly attributable to his employer, who had placed the sergeant in a position of trust and authority in contacting young persons for recruitment into the guard. See Applewhite v. City of Baton Rouge, 380 So.2d 119 (La.App. 1st Cir.1979) in which the City was held liable for the conduct of police officers who used their position of trust and authority to order the plaintiff into their patrol car where they raped her.
Sudduth's conduct, we conclude, was within the scope of his employment. The State of Louisiana is thus answerable in damages for the injuries sustained by the plaintiffs.
Id. at 1296. In this case, however, Caruso was not acting as a scoutmaster for the PAL scouting program when the abuse took place. While the City placed Caruso in a position of trust and authority, his actions were not so closely connected to his employment duties that the risk of harm faced by Bates is fairly attributable to his employer.
In addition, we reject the argument that Caruso was always "on the job" as a police officer. For example, in Roberts v. Benoit, 605 So.2d 1032 (La.1991), the court found the sheriff's office was not liable for an accidental shooting by an off-duty employee (a cook) who had been commissioned as a deputy sheriff. The court based its decision partly on the fact that the sheriff's office had neither given the gun to the cook/deputy, nor was he required to carry one. In its brief, the City quotes a passage from a 1959 New York case, which was also quoted by the Roberts court:
It is important to distinguish this situation from the cases in which intoxicated or unbalanced police officers, generally after a tour of the bars, proceeded to shoot some innocent bystander. Absent proof of prior notice of such propensities on the part of the authorities, the city may not be held liable under the doctrine because the officer has then gone "outside of his employment, and without regard to his service, acting maliciously, *764 or in order to effect some purpose of his own."
Roberts, supra, at 1038, quoting Collins v. City of New York, 11 Misc.2d 76, 171 N.Y.S.2d 710, 714 (Sup.Ct.1958), aff'd 7 N.Y.2d 822, 196 N.Y.S.2d 700, 164 N.E.2d 719 (1959).
In the instant matter, the City had no knowledge of Caruso's propensity to abuse teenage boys. We conclude that Caruso was outside his employment and was effecting a purpose of his own when the abuse took place.
Admittedly, this is a troubling case, one that we may have decided differently. However, in light of the evidence in the record, we do not find that the trial court was manifestly erroneous or clearly wrong by finding in favor of the City. Consequently, we affirm the judgment.
AFFIRMED.
NOTES
[1] The initial monies for the PAL program came from a federal block grant, but the program continued though donations from people and companies in the New Orleans area.
[2] There is some evidence in the record that Mrs. Bates and Caruso were dating at the time the abuse took place, however, the appellant never spent a night at Caruso's home prior to joining the PAL scouting program.
[3] The appellant is a mentally challenged young man.
[4] There is conflicting evidence in the record on this point
[5] The LeBrane factors inquire into:

(1) whether the tortious act was primarily employment rooted;
(2) whether the violence was reasonably incidental to the performance of the employee's duties;
(3) whether the act occurred on the employer's premises; and
(4) whether it occurred during the hours of employment.
LeBrane, 292 So.2d at 218.